## UNITED STATES *v.* PAYNE.

### (*District Court, W. D. Arkansas.* 1881.)

1. **FORFEITURES AND PENALTIES—HOMESTEAD AND PRE-EMPTION LAWS.**

   The fact that the title to land may be in the United States does not necessarily make it that part of the public domain which is subject to settlement by citizens of the United States under the homestead and pre-emption laws.

2. **GOVERNMENT LAND—CONVEYANCE OF TITLE.**

   The treaty-making power has a right to convey title to the lands of the United States without an act of congress, and if a treaty acts directly on the subject of the grant, it is equivalent to an act of congress, and the grantee has a good title.

3. **SAME—RESERVATION.**

   The treaty-making power can reserve a part of the public domain for a specific lawful purpose, because this is but the exercise of a less higher power than that which conveys title.

4. **SAME—SAME.**

   The president of the United States can, by proclamation or executive order, reserve a part of the public domain for a specific lawful purpose.

5. **SAME—SAME.**

   Congress can, by law, reserve a part of the public domain for such purpose.

6. **HOW A RESERVATION MAY BE SET ASIDE.**

   No set form of words or phrases need be used to set aside a reservation. It is enough if there are sufficient words to indicate the purpose of the power that acts to show that it intended to act in a given case.

7. **INDIAN COUNTRY—RIGHTS OF FREEDMEN.**

   Colored persons who were never held as slaves in the Indian country, but who may have been slaves elsewhere, are like other citizens of the United States, and have no more rights in the Indian country than other citizens of the United States.

8. **TREATIES—HOW CONSTRUED.**

   A treaty, like an ordinary contract or a statute, must be construed to give it effect, if possible, and courts always adhere to this rule. In construing a treaty, we have a right to take into consideration the situation of the parties to it at the time it was made, the property which is the subject-matter of the treaty, and the intention and purposes of the parties in making the treaty. To get at the purposes and intention of the parties we have a right to consider the construction the parties to the treaty, and who were to be affected by it, have given it, and what has been their action under it.

**9. SAME—WHAT CONSTRUCTION TO BE ADOPTED—THIRD PARTIES.**

The construction of a treaty to be taken as the true one is the one which has been adopted and acted upon by all the parties to it, unless the parties to it were mutually led into this construction by fraud or mistake. In a case where the mutual construction was in the face of the language used, and the right of third parties had intervened, the language would be taken as governing.

**10. APPROPRIATED LANDS—SUBSEQUENT LAWS.**

A tract of land lawfully appropriated to any purpose becomes thereafter severed from the mass of public lands, and no subsequent law or proclamation will be construed to embrace it, or to operate upon it. Although no exception is made, congress cannot be supposed to include it by a law general in its terms. This doctrine applies with more force to Indian than to military reservations.

**11. INDIANS' TITLES—WHEN DEVESTED.**

As soon as Indians part with their title the land ceases to be Indian country without any further act of congress, *unless, by the treaty by which the Indians parted with their title, or by some act of congress or some executive order of the president, a different rule was made applicable.*

This is a civil suit, in the nature of an action of debt, to recover from defendant a penalty of $1,000, for having violated the law of the United States by being in the Indian country contrary to said law. The complaint charges that the defendant heretofore, to-wit, on the fifth day of September, A. D. 1879, being in the Indian country contrary to law, was removed by the military forces of the United States, and that afterwards, to-wit, on the tenth day of August, A. D. 1880, he, the said defendant, did return to said Indian country, and was found therein, contrary to the form of the statute in such case made and provided. For this reason plaintiff claims an action hath accrued against the defendant.

The defendant files his amended answer, in which he denies that he owes and is indebted to the plaintiff in the sum of $1,000, or any other sum, in manner and form as stated in the complaint. He denies that on the third day of May, 1880, or the tenth day of August of that year, or at any other time, he was in the Indian country, or any part thereof. He denies that he was at any time removed from the Indian country, or any part thereof. Defendant further claims that by a treaty entered into between the United States and the Seminole tribe of Indians, on March 21, 1866, they sold to the United States a large tract of land then owned by said tribe in the country known as the Indian Territory, situated between the Canadian river and the North Fork of the Canadian river, and between the ninety-seventh and ninety-eighth degrees of west longitude; that said lands have ever since been, and are now, the property of the United States by an absolute and perfect title in fee-simple, and that they are a part of the public domain of the United States; that there is no Indian nation or tribe that has any title or right to any part of the same, or any occupancy or possession thereof.

Defendant further answers that he made a settlement on section 14, in township 11 north, of range 3 west of the Indian meridian, under the pre-emption and homestead laws enacted by the congress of the United States; that said section is a part of the land so purchased and acquired by the United States from the Seminole Indians, and that it is situated within 40 miles of the line of the

Atlan'ic & Pacific Railroad, to-wit, about 30 miles therefrom; that said settlement was made by him on or about the first day of May, 1880; that on the fifteenth of that month an officer of the United States army and a squad of soldiers arrested him on or near said section 14, and removed him from said lands, and from said so-called Indian Territory; that he returned to his said claim and settlement on or about the fourth day of July in said year, and was again, on or about the fifteenth day of said month, arrested at or near the same place by the officers and soldiers of the United States army, and forcibly expelled from said lands and from said territory.

To this answer plaintiff files a demurrer, and for cause thereof says: (1) that said answer does not set up sufficient facts to constitute a defence to plaintiff's complaint; (2) that defendant's said answer is otherwise defective and wholly insufficient to constitute a defence to plaintiff's complaint, and does not entitle him to the relief prayed for.

*Wm. H. H. Clayton,* U. S. Dist. Atty., and *D. W. C. Duncan,* for plaintiff.

*Thos. H. Barnes, Jas. M. Baker,* and *Wm. Walker,* for defendant.

PARKER, D. J. The pleadings in this case seem to raise and present to the court for decision all the points there are in the case. The complaint alleges a state of facts which, if true, would render the defendant liable to the penalty. Sections 2147, 2148, Rev. St. 374. No white person has a right to go into the Indian country to reside without a permit; and if such person has once been put out, and returns, he becomes liable to a penalty of a thousand dollars, to be recovered in an action like the present one. The defendant denies that he is an intruder into the Indian country. He does not stop with this denial, but proceeds in his answer to set up certain facts; but says these facts do not make him liable, but that he was an American citizen, legally and rightfully in the country. The demurrer admits his facts, but says on them he is liable.

The question presented for decision in this case is, was the land upon which the defendant had attempted to make a settlement, and the place where he was arrested the first and second time, a part of, or within, the Indian country? If so, upon the other facts he is liable to the penalty, because he admits his arrest and expulsion from the country, and under the law the liability arises upon a second intrusion into the Indian country after having been once expelled. The defendant claims that the land purchased from the Seminoles by the United States, by the treaty made with them March 21, 1866, is a part of the public lands of the United States, and as such is open to homestead and pre-emption settlement; that he made a settlement thereon under the laws of the United States relating to homestead and pre-emptions. He does not show that he has taken any of the requisite

steps to give him even an inchoate homestead or pre-emption right. He could not, of course, if these lands were subject to the homestead and pre-emption laws, hold what he claims to have settled on, to-wit, section 14, because, under the law, one person can only homestead or pre-empt 160 acres. Rev. St. §§ 2259, 2289. Did he have the right to homestead or pre-empt any of the lands conveyed by the Seminole treaty of 1866?

Section 2258, Rev. St., provides—

"That lands included in any *reservation* by *any treaty, law, or proclamation* of the president, *for any purpose,* shall not be subject to the right of pre-emption unless otherwise specially provided by law."

Section 2258 of the same statute provides—

"That every person who is the head of a family, or who has arrived at the age of 21 years, and is a citizen of the United States, or who has filed his declaration of intention to become such, as required by the naturalization laws, shall be entitled to enter one quarter section or a less quantity of *unappropriated* public lands upon which such person may have filed a pre-emption claim, or which may at the time the application is made be subject to pre-emption, at one dollar and twenty-five cents an acre."

Are these lands *reserved* by any treaty, law, or proclamation of the president? If so, they are not subject to pre-emption settlement. Are they unappropriated public lands? If they are appropriated for another purpose than homestead settlement, or if they are not subject to pre-emption, they cannot be settled upon and acquired under the homestead laws. If these lands are included in a reservation for any lawful purpose, made by treaty, law, or proclamation of the president, they cannot be settled upon and claimed by citizens of the United States, and the defendant would be wrongfully upon them. The lands upon which the defendant claims to have settled were originally a part of the Louisiana purchase. By such purchase the title thereto was vested in the United States. By the act of congress of May 28, 1830, the president was authorized to set apart the country now known as the Indian country or Indian Territory into certain districts for the use and occupancy of Indians to be removed there from east of the Mississippi river.

The provisions of the act of 1830 were supplemented by treaties bargaining and conveying certain tracts to certain tribes, by far the greater part of it having been conveyed to five nations, to-wit: the Cherokees, Choctaws, Chickasaws, Creeks, and Seminoles. These assignments were made to these tribes by the several treaties made with them, and the president, under the act of 1830, put them in possession thereof. The lands in controversy are a part of those

which were, by the treaty of the fourteenth of February, 1833, made with the Creeks, set apart to them. By the treaty of the seventh of August, 1856, made between the United States and the Creeks, they conveyed these lands to the Seminoles; provided, however, that the same should not be sold or otherwise disposed of without the consent of both tribes legally given. The Seminoles, by the third article of the treaty made between them and the United States, March 21, 1866, provided as follows:

"In compliance *with a desire of the United States to locate other Indians and freedmen thereon*, the Seminoles cede and convey to the United States their entire domain, being the tract of land ceded to the Seminole Indians by the Creek nation under the provisions of article 1, treaty of the United States with the Creeks and Seminoles, made and conceded at Washington, D. C., August 7, 1856." This conveyance was made by the Seminoles, as is recited in the preamble to this treaty, "in view of the urgent necessity of the United States for more land in the Indian Territory."

The Creeks, by the seventh article of the treaty of June, 1866, consented to this session by the Seminoles. To my mind, this language, used in the third article of the Seminole treaty, amounts to a conveyance of the title of the land described to the United States. But the fact that the title of the land is in the United States does not necessarily make it that part of the public domain which is subject to settlement by citizens of the United States under the homestead and pre-emption laws, because those laws are explicit that any lands which have been *reserved* by any treaty, law, or proclamation of the president are no part of the public lands of the United States subject to those laws, so long as such reservation continues, and when any part of the public lands have been once lawfully reserved that reservation cannot be set aside except by a clear and explicit act of the lawful authority, showing thereby clearly a purpose to open to settlement, by the citizen, the land reserved.

If the language of this third article of the Seminole treaty amounts to a reservation, then the lands sold by the terms of said treaty to the United States by the Seminoles, and lying in the Indian country between the Canadian and the North Fork of the Canadian river, and between the ninety-seventh and ninety-eighth degrees of west longitude, and a part of which this defendant was expelled from and to which he returned a second time, and upon which he was a second time arrested, are not such lands as persons have a right to treat as public lands and settle upon under the homestead and pre-emption laws. Did the power which made this treaty have a right to reserve this land? Most certainly. The treaty-making power has a right to

convey title to the lands of the United States without an act of Congress, and if a treaty acts directly on the subject of the grant, it is equivalent to an act of congress and the grantee has a good title. *Holden* v. *Joy*, 17 Wall. 247; *U. S.* v. *Brooks*, 10 How. 442; *Meigs* v. *McClung*, 9 Cranch, 11. As long ago as the *Cherokee Nation* v. *Georgia*, 5 Pet. 1, and *Worcester* v. *State of Georgia*, 6 Pet. 515, the supreme court of the United States, speaking through that most eminent of all American judges, Chief Justice John Marshall, held that a treaty with an Indian tribe was like a treaty with a foreign nation, as far as the power of the contracting parties was concerned; that it, like a treaty with a foreign power, was a law equally as sacred and equally as binding as a law of congress. Now, if the treaty-making power can convey title, it can reserve a part of the public domain for a specific purpose, because this is but the exercise of a less higher power than that which conveys title. So can the president of the United States, by an executive order, reserve a part of the public domain for a specific lawful purpose. *Wolcott* v. *Des Moines Co.* 5 Wall. 681; *Grisar* v. *McDowell*, 6 Wall. 363. In the latter case the court says:

"From an early period in the history of the government it has been the practice of the president to order lands to be reserved from sale and set apart for public purposes, and that numerous acts of congress recognize the authority of the president in this respect as competent authority."

The United States court for Nevada, in the case of *U. S.* v. *Leathers*, has decided the same thing. So can congress by law reserve a part of the public domain. Then we find a reservation may be made, either by treaty, executive order, or by act of congress, and all of these methods are expressly recognized by the homestead and preemption laws. Then we find the power that made this treaty with the Seminoles had the right to reserve these lands for an Indian reservation or any public purpose. The question is, has this power done so in this case? Did the treaty-making power employ such language as to indicate its purpose to reserve the land in controversy? No set form of words or phrases is necessary to set aside a reservation. The sovereign is not parting with the title, but only setting it apart to be used for a specific public purpose. It is enough if there are sufficient words to indicate the purpose of the power that can act to show that in the given case it intended to act. Article 3 of the Seminole treaty says: "In compliance with the desire of the United States to locate other Indians and freedmen thereon," the Seminoles cede and convey, etc. And, in the preamble, it is recited that "in

view of the urgent necessities of the United States for more lands in the Indian Territory," it requires a cession by said Seminole nation of a part of its present reservation. What was this urgent necessity for more lands in the Indian Territory? Certainly not to settle citizens of the United States upon, because it is a part of the open history of the times that both the legislative and executive departments of the government have constantly and all the time refused to do this, and the executive department has at all times put forth its arm to keep citizens of the United States out of that country. Then, could it have been desired by the government for settlement by the citizens of the United States under the homestead and pre-emption laws? Hardly, in the face of the fact already cited, and of the further fact that the government had given its pledges by its treaties and laws, from the organization and occupation of that country by the Indians, that, with the exception of a few privileged persons, white settlers were to be kept out of that country. Those pledges remain to this day, and the government, through its executive, whose duty it is to execute them, has constantly sought to make them good. All the tribes in the Indian Territory have implied or express pledges made in treaties or laws of the United States that they are to be free from the intrusion of white persons. Whether this policy is right or wrong, whether it is a good or bad one, persons may entertain a difference of opinion. The courts did not establish it, but the law-making power did. The courts cannot change it, as they do not make the laws. It must be changed by the power that established it. Can it be presumed, in the face of these pledges, that the United States felt an urgent necessity pressing upon it for this comparatively small tract of country between the Canadian rivers that it might open it to white settlement, surrounded as it is on all sides by Indian reservations, occupied by different tribes of Indians, except on the north, and there we find the Cherokee lands, which, by the express term of the treaty of July 19, 1866, are to be sold and occupied by friendly Indians? Then, again, we find, by a treaty made with that tribe, February 27, 1867, the United States settled, upon a tract 30 miles square of this identical land conveyed by the Seminole tribe, the Pottawatomie tribe of Indians. Then, again, upon a part of this 30-mile tract, by an act of congress of May 23, 1872, the Absentee Shawnees have been settled; so that now there remains of this whole Seminole cession only about 20 odd townships which is not at this time actually occupied by Indians. Again, by executive order of the president of August

10, 1869, a large portion of this country obtained from the Seminoles was assigned for temporary occupation by the Cheyennes and Arrapahoes.

These acts of the government plainly indicated its purpose in agreeing to the third article of the Seminole treaty, and what it accepted these lands for. Now we must look to the acts of the government since the adoption of this treaty in order to understand its purpose. We find that in the year 1866 it entered upon the policy of settling tribes of Indians, other than the five civilized tribes, in the Indian country. Since that time, by treaties, laws, and executive orders of the president, it has settled upon reservations in the Indian country the Cheyennes and Arrapahoes, the Kiowas, the Comanches, the Washitas, the Pawnees, the Sac and Fox, the Nez Perces, the Poncas, the Modocs, the Kansas, the Osages, the Pottawatomies, the Absentee Shawnees, as well as some other small tribes. This explains why the treaty-making power thought, on March 21, 1866, that there was an urgent necessity of the government for more lands in the Indian Territory. This shows that the government had not only a desire to locate other Indians in the Indian Territory, but to a great extent it has consummated that desire.

It is a matter of public history that a number of these tribes which have been removed to the Indian country, taking advantage of the embarassment of the government growing out of the war of the rebellion, had gone on the war-path. The government was desirious of securing peace with them, and of settling them upon reservations where they could be civilized. It entered into treaties by which they were to be and were removed to the Indian country. Then, again, the white people in other localities were pressing on other tribes, and demanding of the government their removal. To get them out of the way of the white settlements, and to locate them where they would be free from intrusion by the whites, they were removed to the Indian country. It is true, but few of these tribes were settled on the lands in controversy, but I cite the conduct of the government in order to arrive at its policy in regard to the Indian country, and from that policy to receive aid in the construction of the third article of the Seminole treaty. The government wanted to locate other Indians and freedmen thereon. The meaning of the United States in regard to locating other Indians thereon is plain, when we consider what action it has taken since that time in regard thereto. True, congress has recently prohibited the location of certain other tribes of Indians

in that country, but it has not by any law changed the general policy. It may have considered that these tribes were not proper ones to bring in contact with other Indians, more civilized.

What did the government mean by locating "freedmen thereon?" Let us again go back to the history of the time when this treaty was made. We find that colored people were held in slavery in all the civilized tribes of the Indian Territory. Slavery was abolished there, as well as elsewhere in the United States, by the emancipation proclamation of the president and by the thirteenth amendment to the constitution, adopted the thirteenth of December, 1865, and such abolition of slavery was recognized by these tribes in the several treaties made with them in 1866. The government was desirous of protecting these freedmen and of securing them homes. It was not known how well the several Indian tribes who had held them in slavery would observe their pledges to secure them the same rights they enjoyed. It was feared that prejudice growing out of their former condition as slaves and of race would be so strong against them that they would not be protected by the Indians. The government had given them the boon of freedom, and it was in duty bound to secure it, in all that the term implied, to them. The government feared that to do this it might be necessary to settle them in a colony by themselves. This purpose of the government, should it become necessary, was manifested by the terms of the Choctaw treaty of April 15, 1866. Therefore, in making the treaty with the Seminoles, it sought to provide a home for such freedmen as had been held in slavery by the Indians in the Indian Territory, should that necessity occur, to secure them in their rights. In the face of the surrounding condition of things at the time this treaty was made, we must conclude the government meant these freedmen who had been slaves in the Indian Territory, and none others; and these could only be settled on this land by the authority of and with the permission of the government. Colored persons who were never held as slaves in the Indian country, but who may have been slaves elsewhere, are like other citizens of the United States, and have no more right in the Indian country than other citizens of the United States.

Again, if this land is open to homestead or pre-emption settlement, it has been so ever since the treaty of 1866 with the Seminoles, and yet the government has never attached it to any land district. In perfecting title under the law the settler has to take certain preliminary steps. It has been the policy of the government, when lands were open to settlement, as soon afterwards as possible, to establish

a new land district, or attach the lands thrown open to settlement to some district already established. It has not done so in this case, showing again how one of the parties to this treaty, which is a contract between the United States and the Seminoles, has construed it.

*A treaty, like a statute or contract, must be construed to give it effect, if possible, and courts always adhere to this rule.* In construing this treaty we have a right to take into consideration the situation of the parties to it at the time it was made, the property which is the subject-matter of the treaty, and the intention and purposes of the parties in making the treaty. To get at this intention we have a right to consider the construction the parties to the treaty, and who were to be affected by it, have given it, and what has been their action under it. The action of the United States, which I have cited, is sufficient to show its construction of the treaty. It is a matter of public notoriety that the other party to the treaty has agreed with the United States in its construction. Then we have both parties to it agreeing upon the same construction. That is the construction to be taken as the true one, unless the parties to it were mutually led into this construction by fraud or mistake. In a case where the mutual construction was in the face of the language used, and the rights of third persons had intervened, the language would be taken as governing. But in this case the right of the third person is only inchoate at best, and it comes through and under one of the contracting parties, the United States, is not yet a vested right, and is claimed with the full knowledge of the party claiming the right of the condition of this land when he set up his right. Therefore, there is no hardship on him.

It must be remembered that the United States is the custodian of all the lands in the United States, whether reserved or unreserved, and it is its power and province to say, by either law, treaty, or executive order of the president, when these lands are open to settlement by the citizen. Has it said that these lands in controversy, by the third article of the Seminole treaty, are so open to settlement? The reservation of lands for any specific purpose by the government, if expressed in the most accurate, concise, and precise form of words, is but an expression of a desire of the government to use them for that purpose. It does not part with its title by reserving them, but simply gives notice to all the world that it desires them for a certain purpose; therefore, the same precision and accuracy is not required as in case of a conveyance. Does not the government express its desire by the language of this treaty? The language is: "In compliance with a *desire of the United States to locate other Indians and freedmen*

*thereon,*" the Indians convey, etc. There is an expression of all that could be done by the most formal instrument, to-wit, the desire or purpose of the government. The government for 15 years, judging from its action, thought it had given expression to its desire sufficiently plain to reserve these lands. The Indians have thought so too, and so I think. I am of the opinion that it is sufficient to set aside the land now in controversy for the purpose expressed in this third article of the treaty. But it is claimed in this case that this land is open to settlement by virtue of the sixth section of an act of congress, approved July 27, 1866, entitled "An act granting lands to aid in the construction of a railroad and telegraph line from the states of Missouri and Arkansas." That section is as follows:

"That the president of the United States shall cause the lands to be surveyed for 40 miles in width, on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad, and the odd sections of land hereby granted shall not be liable to sale or entry or pre-emption, before or after they are surveyed, except by said company, as provided in this act; but the provisions of the act of September, 1841, granting pre-emption rights, and the acts amendatory thereof, and the act entitled 'An act to secure homesteads to actual settlers on the public domain,' approved May 20, 1862, shall be and the same are hereby extended *to all other lands* on the line of said road when surveyed, excepting those hereby granted to said company."

It is further claimed that this grant of lands to this railroad company applies to lands in the Indian country. The executive department of the government decided through the commissioner of the general land-office, October 13, 1877, in the following language, that it did not:

"But in addition [he says] I think the demand cannot be complied with, for the reason that the company has no grant of lands in the Indian Territory; that without entering upon the question of the intent of congress to make a present grant of such lands, which I do not understand the company to claim, an ultimate grant, even, was not contemplated by the act, except such grant might be acquired from the Indians by the company."

Whether this is so or not I do not decide, because it is not necessary in this case. It must be remembered that this treaty with the Seminoles was prior to the act of congress just cited. The first was adopted March 21, 1866, and the latter July 25, 1866.

It is a principle of the law, declared by the supreme court of the United States in *Wilcox* v. *Jackson,* 13 Pet. 498, that—

"Whenever a tract of land has been appropriated to the public use it is severed from the mass of the public domain, and subsequent laws of sale are not construed to embrace it, though they do not in terms except it."

Again, the supreme court, in the *Leavenworth, Lawrence & Galveston Road* v. *U. S.* 92 U. S. 733, affirm the doctrine in *Wilcox* v. *Jackson*, that a tract lawfully appropriated to any purpose becomes thereafter severed from the mass of public lands, and that no subsequent law or proclamation will be construed to embrace it, or to operate upon it, although no exception is made of it. "This doctrine," says the court, "applies with more force to Indian than to military reservations." And, again, it says: "Congress cannot be supposed to include them by a subsequent law general in terms." If this land in controversy was, by the third article of the Seminole treaty, reserved for Indian settlement by competent authority, then it was an Indian reservation as much as if it was actually occupied by Indians by authority of the government. It having been reserved prior to the passage of the railroad grant and charter, and this law being general in its terms, not making any special reference to these lands cannot be held to embrace them, although it declares that all other lands except those granted to the railroad are open to settlement. I think these cases are conclusive on this point.

But, again, suppose we take the language of the section and undertake to apply the pre-emptiom law of 1841, and the homestead law of 1862, "to all other lands," and to what conclusion must we come. If we apply these laws, we must apply the whole of them, and in such application we find that these laws did not apply to any lands reserved by treaty, law of congress, or proclamation of the president. These lands being reserved, they did not apply to them any more than the homestead and pre-emption laws now in force apply to them, and the words "all other lands on the line of said road" must, under the law, be construed to mean all other lands not reserved by treaty, law of congress, or proclamation of the president. I think, therefore, from the authorities I have cited, and from the language of this section, that there is no doubt that this act of congress has not changed the lands in controversy from the condition of a reservation. They being in that condition, they can only be taken out of it by clear and specific language, expressive of the will of the power which under the law can restore them to the public domain, subject to homestead and pre-emption settlement by the citizen.

One other point is necessary to be decided in this case, and that is whether these lands, although they may be reserved, are a part of the Indian country, because lands may be reserved and yet not be a part of the Indian country. The government can and does reserve lands for a variety of purposes other than Indian reservations,—for

forts, arsenals, dock and navy yards, national parks, etc.; and because they may be reserved, they do not necessarily become a part of the Indian country. It is necessary they should be a part of such country, in this case, to make the defendant liable to the penalty sued for; because, although these lands may be reserved from settlement, and the defendant would have no right to settle on them, and could be by competent authority ejected from them, yet, to make him liable under this statute, he must have intruded into the Indian country, been put out once, and returned thereto a second time. The defendant was the first and second time arrested upon lands which were originally the lands of the Creeks. They were defined by treaty with them, and when owned by them were clearly and unmistakably Indian country. By treaty of the seventh of August, 1856, the Creeks conveyed these lands to the Seminoles. They were taken possession of and occupied by the Seminoles until they were conveyed to the United States. They were most certainly a part of the Indian country all this time. They are within what is well known and recognized by the government of the United States as the exterior boundaries of what is called and known as the Indian country. These boundaries have been established by acts of congress, treaties, and proclamations of the president. The case of the *American Fur Co.* v. *U. S.* 2 Pet. 358, decides "that a country which has been purchased of the Indians, and which is not included within the boundary line defining the Indian country, ceases to be Indian country." This is undoubtedly true, but it does not decide that a country purchased from the Indians *ipso facto* ceases to be Indian country.

It may be within the exterior boundaries of their country over which the laws of the United States for the government of the Indian country extend, or there may be some law or treaty or executive order under which it still continues to be Indian country, as in the case of the *U. S.* v. *43 Gallons of Whisky,* 93 U. S. 188.

The case of *Bates* v. *Clark,* 95 U. S. 204, decides that as soon as Indians part with their title the land ceases to be Indian country without any further act of Congress, *unless by the treaty by which the Indians parted with their title or by some act of congress a different rule was made applicable to the case.* I think it clear in this case that by the terms of the Seminole treaty a different rule was made applicable, and this view of the case is strengthened when we consider the purpose for which the government purchased it; the fact that it is surrounded on all sides by other Indian reservations; and the further fact that it is within the exterior boundaries of what is now and

what has been for over a quarter of a century known and recognized by the government of the United States, by the surrounding states, and by the public generally as *the Indian country*.

The moment the government purchased the land, by the same act, simultaneous with such purchase, it reserved it for a specific purpose. That purpose was the same as the one for which the land had been used for 33 years—ever since the Creek treaty of the fourteenth of February, 1833. It was Indian country beyond question while the Creeks and Seminoles occupied it. The government obtained it for Indian occupancy. Of course it could not at the same moment make the treaty and transplant other tribes on the land, but we find it commenced to do so as soon thereafter as possible. It has gone on and treated it as devoted to that purpose, by settling on a large portion of it Indian tribes. It cannot be presumed that for 15 years the government has had a tract of country within the very heart of the Indian country which it purchased and has permitted to remain in such condition as it might become a place of refuge for criminals and outlaws, who could depredate and prey upon their Indian neighbors and others with immunity from punishment; especially when the government has pledged protection and security from intruders to all the tribes in the Indian country. Yet this is so if this is not Indian country, because the laws of the United States would not extend over it, and it would not be within the jurisdiction of any state or territory. It never intended this. It did not, by its treaty of purchase with the Seminoles, do it. By its act of reservation of this country, situated as it was, and being reserved for the purpose it was, it continued still to be Indian country as much as if it had been at that time entirely occupied by Indians. Now, in the estimation of many persons, it may be desirable to open this country to settlement. If so, it must be done by the power that has a right under the constitution and laws of the country to do it. It must not be asked or expected that, to accomplish this end, the courts will break or even bend the timbers of the law; especially when that power in the government which could act has time and again refused to act. The courts do not make the laws. They interpret, construe, and execute them as they find them.

From my views of the law as applicable to this case, upon the facts set up by the defendant, he is liable for the penalty under the law, and the demurrer to the answer must be sustained. It is so ordered.