[Decided January 25, 1887.]

# UNITED STATES AND OTHERS *v.* FRANK TAYLOR.

INDIANS — RIGHTS TO FISHERIES — TREATY OF JUNE 9, 1855 — INJUNCTION.
— Under the treaty of the United States with the Yakima tribe of Indians, entered into June 9, 1855, conferring on them the right of taking fish at all usual and accustomed places, in common with the citizens of Washington Territory, etc., the privilege is reserved to them to enjoy all the fisheries they had theretofore enjoyed; and when a person, under an act of Congress passed subsequently to the treaty, obtained a patent for homestead land abutting upon the Tum Water fishery, and erected and maintained a fence thereon, which obstructed the approaches to the fishery, and prevented the enjoyment by the Indians of the right which had been so reserved to them, equity will interfere by injunction and cause the removal of the obstruction.

APPEAL from the District Court holding terms at North Yakima. Fourth District.

The complaint sets forth that the Yakima tribe of Indians, with confederated tribes, formerly owned and occupied a large area of land, embracing within its scope what are now the several counties of eastern Washington Territory; that the Columbia River flowed through their domain; that this river abounded in salmon, a fish upon which, from time immemorial, the tribe of Indians had largely subsisted; that while the fish were used by all, to many members of the tribe they constituted an indispensable article of food; that from traditional times, these fish had annually entered the Columbia River from the sea, and gathered in great numbers at a few certain places or fisheries, the principal and most important of which was the one mentioned; that this fishery was within the country of these confederated Indian tribes, and to it the members of the tribes had been accustomed to go during the fishing season, and upon the adjacent river banks found a temporary home for themselves and families, pasturage for their ponies, and places to land and cure the fish which were preserved for winter use.

The complaint alleges the making and conclusion between the confederated tribes and the United States of the treaty of June 9, 1855, ratified by the Senate March 8, 1859; that in consideration of certain annuities and compensations, made by the government to the Indians, they had ceded to the United States most of their country, and made concessions relative to rights of way and public highways across that portion of land they retained as their permanent reservation; that certain other rights and privileges were by the Indians expressly reserved; among which were the following: "The right of way with free access from the same [their reservation] to the nearest public highway, . . . . and also the right, in common with the citizens of the United States, to travel upon all public highways; . . . . the exclusive right of taking fish in all streams where running through or bordering said reservation, . . . . as also the right of taking fish at all usual and accustomed places, in common with the citizens of the territory, and of erecting temporary buildings for curing them."

The complaint also sets forth, that by reason of the nature of the banks of the river the approach to the fishery was limited to certain defiles, or passage-ways; that at the time of the conclusion and ratification of the treaty, said Indians were so using and enjoying said fishery, and continued such use and enjoyment long thereafter, and until prevented by Taylor; that Taylor had fenced in the land bordering the river in front of the fishery, over which the Indians were accustomed to pass in going to and from the fishery, and upon which they landed fish, erected their curing-houses, made their temporary abodes during the fishing season, and upon which they pastured their animals. The fishery is perhaps fifty or seventy-five miles or more distant from the reservation. The complaint averred that the Indian plaintiffs were old men, and through life looked to this source of supply for necessary food, and if deprived of it

would perish. The plaintiffs prayed for an injunction, etc., and other equitable relief.

By his answer the appellee admits the making and ratification of said treaty, and the inclosing of said land by a fence, upon a portion thereof, over which said Indians had been accustomed to travel in going to and from said fishery; that there was no fence built upon the side next to the river, the river itself being the only means of inclosure on that side; but avers that he had the right, as owner in fee of said land, to thus inclose the same to protect his crops growing thereon, notwithstanding said treaty. Appellants replied, and the cause was tried upon these pleadings, and upon the facts as stipulated in a statement agreed to by all parties, which is fully set forth in the opinion of the court. Findings and judgment for defendant, and plaintiffs appealed.

*Mr. W. H. White, United States Attorney*, and *Mr. John B. Allen*, for the Appellant.

A treaty entered into by the United States constitutes a part of the supreme law of the land, and is as much a part of the local law of Washington Territory as a statute lawfully enacted by its legislature. (*Ware* v. *Hylton*, 3 Dall. 236; *Hauenstein* v. *Lynham*, 100 U. S. 483.) When a treaty admits of two constructions, one restrictive as to the rights that may be claimed under it, and the other liberal, the latter is to be preferred. (*Shanks* v. *Dupont*, 3 Pet. 242; *Hauenstein* v. *Lynham*, 100 U. S. 487.) That construction of a treaty should be taken as the true one which has been adopted and acted upon by the parties to it. (*United States* v. *Payne*, 8 Fed. Rep. 892.) While the rule obtains generally of giving to treaties the most liberal construction, with a view of effecting the objects of the parties to them, it has a peculiar and special application in case of such a treaty as the one brought to the court's attention. This is a treaty made by a powerful, enlightened, and Christian nation, with igno-

rant and barbarous tribes, who occupy toward that nation the anomalous attitude of a high contracting party, and at the same time that of a ward. The treaty is framed in the tongue of the civilized nation. For the aptness and adequacy of its language to protect their reserved rights as well as to cede their country, the Indians were not only dependent upon the nation with whom they dealt, but even for the interpretation and construction of that language. The court should not hesitate, therefore, to give the most extended meaning to the language employed, to prevent the treaty being construed to the prejudice of. the Indians. (*Worcester* v. *Georgia*, 6 Pet. 582; *The Kansas Indians*, 5 Wall. 760.) It may be true that an act of Congress may repeal a treaty. In such case, however, there are peculiar reasons for applying the rule with great strictness. (*Taylor* v. *Morton*, 2 Curt. 454; *The Cherokee Tobacco*, 11 Wall. 621.) It is not within the power of the courts or an executive officer of the government to contravene the provisions of this treaty. To each it is the supreme law of the land. It would not be within the power of the government, in the issuance of a patent, to deprive these Indians of a treaty right secured them. If the right of fishery claimed in this case was reserved to the Indians by treaty stipulation, Taylor and his grantors are charged with knowledge of the same. In short, the reservations of this treaty are in effect imported into the patent. (*The Peggy*, 1 Cranch, 109, 110.)

*Mr. William Lair Hill*, and *Mr. F. P. Mays*, for the Appellee.

By the common law, in the absence of governmental restriction, citizens have the right to take fish in the navigable streams, not at some particular places, but generally. But this right is subject to regulation by the government within whose local jurisdiction the streams lie. (*Coolidge* v. *Williams*, 4 Mass. 140; *Common-*

*wealth* v. *Chapin,* 16 Am. Dec. 386.)   A treaty, however, is under our system of government the "supreme law," —supreme in so high and broad a sense that no state or territorial government, nor any power short of the treaty-making power of the Congress of the United States, can abrogate it.   By this treaty it was intended that neither the territory nor future state of Washington should have the power, in the exercise of the right to regulate fishing in its great streams, to deny to these Indians the same privileges enjoyed by citizens.   It might, for protection against extermination of fish, restrict the fishing to certain times, places, and methods, or, but for the treaty, it might, as governments have often done, altogether exclude all persons not citizens from fishing in its waters; but under this treaty the power to exclude the Indians (who are not citizens), or to deny to them any substantial rights of fishing, which are not denied to the citizen, is taken away in advance; and the Indians are further secured in the right to erect temporary buildings for curing fish,— a right not enjoyed by citizens under the common law.   (*Coolidge* v. *Williams, supra; Cortelyou* v. *Van Brundt,* 3 Am. Dec. 439.)   This right to go on the shore, upon the land of the defendant, to *cure* fish, cannot be extended by construction to include any other right upon the land.   It is a right in derogation of his right to the exclusive possession of his land, as the owner in fee, and must be strictly confined within the prescribed limits.   (*Taylor* v. *Hampton,* 17 Am. Dec. 710.) The right, *in common with citizens,* to take fish, implies neither the right to occupy defendant's land for the purpose of *catching* fish, nor the right to go over and upon his *other* lands, in traveling to and from the river; for that is not specified in the treaty, nor is it included in the right of fishing held in common with citizens. Citizens have *no* rights on the lands of defendant. (*Coolidge* v. *Williams, supra; Cortelyou* v. *Van Brundt,*

*supra.*)   The Indians have the right to go to the places where they have a right to fish in the river, and to go upon the shore to cure their fish.   But this is a right arising out of necessity, not a right specified in the treaty; and the necessity of trespassing upon defendant's land, either for taking fish or for approaching the shore, does not exist.   The river being navigable, and by that fact a public highway, the Indians must use that as a means of approach.   (*Turnbull* v. *Rivers*, 15 Am. Dec. 622.) The right of the defendant to build and maintain the fence is unquestionable.   The treaty expressly secures to the Indians the right to travel upon the public highways of the territory.   So they have a perfect means of approach, by the common highways, to the navigable streams, and by the navigable streams to the places where they desire to take and cure fish.   Defendant, in the stipulated statement of facts, has admitted that the fishery in question is one of the " ancient, usual, and accustomed fisheries" referred to in the treaty.   This admission in the written stipulation is merely a mistaken admission as to the contents and meaning of a law, and does not conclude us, no matter when made, from insisting upon the application of the law as it is, and in its true meaning.   (*Brewster* v. *Striker*, 2 N. Y. 19; *Chatauqua County Bank* v. *White*, 6 N. Y. 253.)   The treaty is so modified by the homestead law, subsequently passed, under which defendant obtained title, that all rights of the Indians upon the lands along the navigable rivers cease as to any particular tract, whenever the land is granted, under the law, to an individual.   The treaty is the supreme law in no higher sense than an act of Congress is the supreme law.   It may be abrogated by an act of Congress.   A subsequent act of Congress in conflict with its provisions repeals it *pro tanto* by implication, just as if it were a previous act of Congress instead of a treaty.   (*Foster* v. *Elam*, 2 Pet. 314; *The Cherokee Tobacco*, 11 Wall. 621.)

Mr. Justice HOYT delivered the opinion of the court.

This suit was brought by the United States, R. H. Milroy, as Indian agent, and several Indian plaintiffs, for themselves and for the Yakima nation or tribe of Indians, of which they are alleged to be members, to restrain the appellee, Frank Taylor, from maintaining a fence around a large body of land abutting upon Tum Water fishery in the Columbia River, which fence the complaint alleges obstructs the land approaches to said fishery, and thus prevents the whole enjoyment thereof claimed by said Indians under their treaty with the United States, entered into June 9, 1855, and ratified by the Senate of the United States March 8, 1859. By his answer the appellee admits the making and ratification of said treaty, and the inclosing of said land by a fence upon a portion thereof over which said Indians had been accustomed to travel in going to and from said fishery; that there was no fence built upon the side next to the river, the river itself being the only means of inclosure on that side; but avers that he had the right, as owner in fee of said land, to thus inclose the same to protect his crops growing thereon, notwithstanding said treaty.

Appellants replied, and the cause was tried upon these pleadings. There are other issues raised by the pleadings, but they are immaterial on this appeal, under the stipulation upon which the decree was given, from which this appeal is prosecuted. The stipulation referred to is as follows: —

"1. That the treaty mentioned in the complaint in this action was made and concluded as therein alleged, and that the plaintiffs are members of the Yakima tribe or nation of Indians, as alleged in the complaint. 2. That prior to and at the time of entering into said treaty, the Tum Water fishery mentioned and described in the pleadings was one of the ancient, usual, and accustomed fisheries of said Yakima.

tribe or nation of Indians, and referred to in said treaty; was used and enjoyed as such by the Indians of said tribe in the manner in the complaint alleged, and continued to be so used and enjoyed therefor, except as hereinafter stated, and that said Indian plaintiffs as members of said tribe or nation so used and enjoyed the same.  3. That subsequent to the conclusion and ratification of said treaty, and before the commencement of this action, the said defendant, Frank Taylor, and his several grantors, obtained patents from the United States to the lands in the complaint and answer described, under the homestead, pre-emption, and other land laws of the United States, and said Taylor is still the owner thereof. 4. That said lands extend to and border upon the Columbia River at the site of said fishery, and are the same lands over and upon which said Indians have heretofore been accustomed to go and return from said fishery, and upon which they had landed and cured the fish taken by them from said fishery, and where they have been accustomed during the fishing season to make their temporary abode and pasture their ponies.  5. That since his acquirement of said land, said Frank Taylor, as owner thereof, has caused the same to be inclosed by lawful fences for the purpose of utilizing the same for agricultural purposes, thereby preventing said Indians from entering upon the same, as before they had been accustomed to do, under the claim that the United States, by means of the said grants, invested him and his said grantors with absolute title to said lands, and the exclusive right to use the same.  6. That upon these facts we submit to the court whether the defendant is entitled to a decree dismissing plaintiff's bill.  If the decision of the court should give the defendant the right to exclude the Indians referred to in the complaint from his said lands, the cause is to be dismissed and judgment entered for defendant; but if the court decides that said Indians are entitled to access over the lands of defend-

ant to said fishery, then the cause shall proceed upon testimony to be taken as to the conduct of defendant complained of, in order to determine what relief shall be granted herein."

From the above stipulation, it will at once be seen that the single question now to be determined is that of the rights of the appellants under said treaty as against the appellee, as owner of the land by title acquired from the United States subsequent to said treaty under the homestead laws and other acts of Congress.

The portion of said treaty under which appellants claim their right to relief herein is as follows: "The exclusive right of taking fish in all streams where running through or bordering said reservation is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with citizens of the territory, and of erecting temporary buildings for curing them, together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land."

Both parties invoke the aid of the rule laid down by the Supreme Court of the United States, that a treaty of this kind is to be liberally construed in favor of the Indians, and that in so far as the language used will allow, that construction will be adopted which will best subserve the object which the Indians at the time the treaty was made would have been most likely to have desired and understood. We must then investigate the treaty in question in the light of this rule. The appellants contend that this clause was a reservation from the force and effect of other portions of the treaty of certain rights therein specified, while the appellee insists that it should be construed as a specific grant of rights by the United States. We think the contention of the appellants must prevail, as it seems to us that the Indians in making the treaty would have been more likely to have intended to

grant only such rights as they were to part with, rather than to have conveyed all, with the understanding that certain rights were to be at once reconveyed to them. What did the Indians intend to reserve to themselves by the words "as also the right of taking fish at all usual and accustomed places, in common with citizens of the territory"?

It will be seen by the statement of facts above set out that at the time this treaty was made there existed within the territory which was the subject-matter of the treaty certain ancient fisheries which had for generations been used as such by said Indians, who had certain well-defined habits and methods connected with such use. And it is contended on the part of appellant that the effect of the words above quoted was to reserve to the Indians the right to enjoy all of these fisheries as they had heretofore.

While on the other side it is claimed that the liberal interpretation of the words in the interest of the Indians would make them apply, not to any particular places of fishing then in use, but to all places which in the future might become usual and accustomed places of fishing, and that as to such places they had the same rights as other citizens, and in addition thereto, the right to use the shore for the purpose of curing their fish.

Many arguments can be and have been made in favor of each of these positions. But when we take into consideration the facts disclosed by this record, and the further fact, which the court knows as a matter of common knowledge, that these Indians were always tenacious in adhering to past customs and traditions, we think the contention of appellant must prevail, as we think it much more natural that these Indians should have desired to preserve as fully as possible a right then and for a long time before enjoyed by them, rather than to have provided for a right to be enjoyed in unknown ways and under new conditions, even although such new rights

might possibly be of more avail than the old; besides, the construction contended for by appellee would make the right to use the shore for the purpose of erecting houses and drying fish a servitude imposed upon all the shore line of the territory, so that every person occupying the same would be liable to have his occupancy disturbed by such floating servitude, though at the time he purchased, the water in front of the land had never been a place used for taking fish. And it seems to us that this servitude would, when viewed from the standpoint of the United States as a contracting party, have been much more objectionable than the other one, though in the minds of the Indians, as the other contracting party therein, old places and methods would doubtless seem, and would probably be, to them of much greater value. The appellee further claims that even if the above position is correct, and the Indians were entitled by said treaty to the rights claimed, still that such rights do not now exist as against the defendant, as by the act of Congress subsequently passed, under which he has taken this land, such treaty has, as to him, been repealed; but with this position we cannot agree, as these laws simply authorize the appropriation by the settler of unappropriated lands, and only authorize the extinguishment of the title which the government holds at the time of the appropriation, and if the land selected by the settler has at such time any servitude or easement impressed upon it, he takes subject thereto.

It follows from what has been said, and from the agreement of the parties, that the judgment of the District Court must be reversed, and the cause remanded for further proceedings in accordance with such stipulation and this opinion.

GREENE, C. J., and LANGFORD, J., concurred.