[No. 26300. Department Two. December 11, 1936.]

THE STATE OF WASHINGTON, *Appellant*, v. ALFRED EDWARDS *et al., Respondents.*[1]

[1] Reported in 62 P. (2d) 1094.

468

*The Attorney General, L. C. Brodbeck, Assistant,* and *Richard Welts,* for appellant.

*J. Charles Dennis* and *Owen P. Hughes,* for respondents.

TOLMAN, J.—The respondents were charged by information in two counts with the violation of § 8, chapter 1, Laws of 1935, p. 6 (Rem. Rev. Stat. (Sup)., § 5671-8 [P. C. § 2524-28]), by the maintaining and operating of two certain fish traps and the taking of salmon thereby. Each count charged that the respondents were Indians, that the trap was not authorized by any Federal regulation, and that the acts complained of were done outside of any Indian reservation.

Pleas of not guilty were entered and the case duly proceeded to trial. After all of the evidence had been received, a motion for dismissal was made upon the ground, among others, that the evidence conclusively established that both fish traps were within an Indian reservation. This motion was granted, the trial court in its order reciting:

". . . and it further appearing to the court from the evidence adduced that the said fishing traps, namely, the McMillan trap near Big Hope Island, Puget Sound, and the Point Pull-and-Be-Damned trap located adjacent to Point Pull-and-Be-Damned on Fidalgo Island, Puget Sound, were situated and located upon the tidelands and above the extreme low tide mark on the tidelands surrounding the southeastern end of Perry's Island called 'Shais-quihl' reserved to the Indians under the treaty of Point Elliott of January 22, 1855; and it further appearing to the court that the two traps, namely, the McMillan trap near Big Hope Island, Puget Sound, and the Point Pull-and-Be-Damned trap located adjacent to Point Pull-and-Be-Damned on Fidalgo Island, Puget Sound, were situated wholly within the Swinomish Indian Reservation,

and the court being fully advised in the premises, now, therefore,

"It is ORDERED, CONSIDERED AND ADJUDGED that the information filed in the above entitled case on July 17, 1935, be and the same is hereby dismissed on the grounds and for the reason that the above entitled court has no jurisdiction of the subject matter or persons of said defendants, to all of which the state excepts and the exceptions are allowed."

The state has appealed.

The only question which we find necessary to decide is whether or not the fish traps in question are within the Indian reservation.

The Swinomish Indian reservation was created by a treaty with the Indians concluded in the year 1855 and proclaimed by the President in 1859. 12 Stat. 928. The reservation consisted of and included the peninsula at the south end of Perry Island called "Shais-Quihl." The northern boundary of the reservation was later fixed by executive order as "beginning at the low water mark" on one side and running to "a point where the same intersects the low water mark" on the other side of the peninsula.

The question here is what was meant by the term "low water mark," not as between the state or its citizens or others, not as a matter of ordinary title, nor as concerning ordinary civil rights, but as between an all-powerful government on the one side and the untutored savage of 1855 to 1873, who was a ward of that government, on the other side; and even more than that, because this is a criminal action brought to enforce a penal statute against a ward of the Federal government, who, apparently, was endeavoring to exercise only the rights granted to him by the treaty. What we shall say here therefore is strictly limited to the present situation and must not be construed as applying otherwise.

■ "Low water mark" may have had a technical meaning in 1873, when used in the executive order referred to, but it cannot be assumed that the Indians, whose rights were affected, knew of any such meaning or would understand the words as meaning anything other than that their rights extended just so far as the water ever receded on each side of their peninsula.

There are two low tides each day called the short run out and the long run out. The lower of these daily tides is called "lower low tide." The average of all low tides, both low and lower low, over a fixed period of time is called "mean low tide," and the average of lower low tides over a like period is called "mean lower low tide." Tides which are lower than lower low, and therefore lower than mean lower low, occur at certain seasons and are called "extreme low tide." Hence, in the vicinity of these fish traps, if "low water mark" means anything other than "extreme low tide," the traps or some part of each would be beyond the limits of the Indian reservation.

As we have indicated, we cannot assume that the Indians ever knew of these technical terms or of their meaning, but, being in possession and in the enjoyment of all of the land ever uncovered by the receding tide at and before the time of the making of the treaty, they had a right to assume that, though the treaty limited them to a certain peninsula, their rights on that peninsula were as broad and unrestricted as they had been before.

Under § 4 of the Enabling Act admitting this state to the Union and as a prerequisite to its admission, we disclaimed forever all right and title in and to all lands owned or held "by any Indian or Indian Tribes." The same provision is found in § 2, Art. XXVI, of

our state constitution. See *Jones v. Callvert,* 32 Wash. 610, 73 Pac. 701.

Under well-settled law laid down by the supreme court of the United States, we are bound to construe the grant contained in the treaty, as fixed by the executive order, as it would naturally be understood by the Indians.

"The Indian tribes within the limits of the United States are not foreign nations; though distinct political communities, they are in a dependent condition; and Chief Justice Marshall's description, that 'they are in a state of pupilage,' and 'their relation to the United States resembles that of a ward to his guardian,' has become more and more appropriate as they have grown less powerful and more dependent. . . . "In construing any treaty between the United States and an Indian tribe, it must always (as was pointed out by the counsel for the appellees) be borne in mind that the negotiations for the treaty are conducted, on the part of the United States, an enlightened and powerful nation, by representatives skilled in diplomacy, masters of a written language, understanding the modes and forms of creating the various technical estates known to their law, and assisted by an interpreter employed by themselves; that ·the treaty is drawn up by them and in their own language; that the Indians, on the other hand, are a weak and dependent people, who have no written language and are wholly unfamiliar with all the forms of legal expression, and whose only knowledge of the terms in which the treaty is framed is that imparted to them by the interpreter employed by the United States; and that the treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians. *Worcester v. Georgia,* 6 Pet. 515; *The Kansas Indians,* 5 Wall. 737, 760; *Choctaw Nation v. United States,* 119 U. S. 1, 27, 28." *Jones v. Meehan,* 175 U. S. 1, 20 S. Ct. 1.

See, also, *United States v. Winans,* 198 U. S. 371, 25 S. Ct. 662; *United States v. Ashton,* 170 Fed. 509;

*United States v. Romaine,* 255 Fed. 253; *United States
v. Stotts,* 49 F. (2d) 619.

The Indians, by their continuous use of these tide
lands to the extreme low water mark for the digging
of clams and the like, have demonstrated their under-
standing of what was meant by "low water mark"
and, following the rule announced by the highest court
of the land, we must hold that the judgment of the
trial court follows the law as laid down by the Federal
courts and is just and right.

That judgment is affirmed.

MILLARD, C. J., HOLCOMB, MITCHELL, and BEALS, JJ.,
concur.

