[No. 39388.    Department One.    December 14, 1967.]

THE STATE OF WASHINGTON, *Appellant*, v. ERNEST JAMES
*et al., Respondents.**

*Robert J. Salveson* and *J. L. Coniff*, for appellant.

*Edwin L. Weisl, Jr., Eugene G. Cushing, David Boerner,
Roger P. Marquis, Edmund B. Clark, James B. Hovis,* and
*Hovis, Cockrill & Roy,* for respondents.

*Reported in 435 P.2d 521.

*Robert Y. Thornton, George Woodworth, Roy C. Atchison, Alan Shepard,* and *T. J. Jones, III,* amici curiae.

SHORETT, J.†—This is another Indian fishing case following closely on the heels of *Department of Game v. Puyallup Tribe, Inc.,* 70 Wn.2d 245, 422 P.2d 754 (1967); *State v. McCoy,* 63 Wn.2d 421, 387 P.2d 942 (1963); and *State v. Satiacum,* 50 Wn.2d 513, 314 P.2d 400 (1957). As in the above-cited cases, we are here concerned with a treaty right given Indians "of taking fish at all usual and accustomed places."

The respondents are enrolled members of the federated bands and tribes of the Yakima Indian Nation. They were charged with fishing illegally with set nets for salmon on the Columbia River in violation of RCW 75.12.060. Three of the respondents were arrested on April 18, 1966, and the other two the following day.

The defense of the respondents was that the place at which they were fishing (between the Bridge of the Gods and Bonneville Dam) was a "usual and accustomed" fishing place for members of the Yakima tribe, and therefore, the defendants are immune from criminal prosecution under article 3 of the Treaty With The Yakamas, June 9, 1855, 12 Stat. 951.

The position of the state of Washington is threefold: (1) This place was not "usual and accustomed" to the Yakimas, but was, in fact, "usual and accustomed" to the Cascades who were not parties to the said treaty; (2) the restrictions on Indian and other fishing under RCW 75.12.060 are necessary and reasonable to protect and preserve the anadromous salmon run on the Columbia River; and (3) the congressionally approved Columbia River Compact entered into between the states of Washington and Oregon has abrogated the rights of Yakima Indians to fish in this area.

The defendants waived jury trial and evidence was received bearing upon the issues raised.

---

†Judge Shorett is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

The evidence concerning the relationship of the Indian tribes or bands took a wide range — from the testimony of Dr. Herbert C. Taylor, an anthropologist, to that of a great-granddaughter of a chief named Sla-Kish, who with 13 other Indians signed the treaty. An historian of the Yakima tribe and other descendants of Sla-Kish also testified.

Evidence was introduced by respondents that the area involved, above what is now Bonneville Dam in Skamania County and herein referred to as the Cascade Fisheries, was the "usual and accustomed" fishing place of a band or tribe of Indians associated with the Yakimas; that although these Indians were later known as Cascade Indians they may not have acquired the name until after the signing of the treaty in 1855; that Sla-Kish, a resident of the area, signed the treaty for the Indians who lived and fished nearby. Although Sla-Kish was a member of the band or tribe which fished at the Cascade Fisheries, the name "Cascade" or "Cascade Indians" does not appear in the preamble of the treaty which names the Yakima and 13 other associated tribes. The Indians who signed the treaty affixed their X's on the last page without any designation of who represented which band or tribe. The state contradicted the respondents' assertion that the Cascade Indians were part of the Yakima Nation and introduced testimony to the effect that the Cascade tribe was separate and distinct from the Yakimas and not affiliated in any way.

Upon conflicting evidence the court found that the Cascade Indians were a part of the Yakima Nation at the time of the treaty and that Sla-Kish signed on their behalf. Since appellant attacks these findings a somewhat detailed recitation of the evidence is necessary.

Uncontroverted evidence was received that the Yakima Indians have continued to fish at the Cascade Fisheries from the time of the signing of the treaty until the present. Further evidence showed that some of the Indians from the area of the Cascade Fisheries were given allotments in the Indian Reservation of the Yakimas.

When we reflect that the Indians had no written language and over one hundred years have elapsed, we can appreciate the difficulty courts have in determining the facts surrounding the execution of such treaties. Indeed, most of the testimony upon which the trial court relied for its findings of fact was hearsay admitted without objection under the family legend doctrine.

The trial court admitted in evidence a report dated January 19, 1889, of George W. Gordon, special Indian agent who had been sent to the territory to investigate "fishing privileges guaranteed by treaties." In this report he refers to certain Cascade Indians living near White Salmon, 20 or 30 miles from the Cascade Fisheries, who "complained to me that they were not only disallowed the privileges of taking fish, but that suits for trespass had been instituted against some of them by the said company [Oregon Railway and Navigation Company] . . . ." Reference to the map introduced in the case demonstrates that 20 or 30 miles from the confluence of the White Salmon River and the Columbia River would be approximately the location of the area involved in this case. Mr. Gordon's report continues with the comment that these Indians had informed him "that although they were now known as the 'Cascade Indians' they originally belonged (and at the time of the treaty June 9, 1855) to the Yakima tribes or nation . . . and that they had been accustomed from time immemorial to take fish at these fisheries."

Mr. Gordon's report also enclosed a copy of a letter written by him and dated July 26, 1888, to the superintendent of the Oregon Railway & Navigation Company in which he says:

> . . . I beg leave to say that if these indians [*sic*] belonged to any of the tribes, thirteen in number, (and they assure me that they did) with which the treaty referred to was made they are not legally subject to suits for trespass for fishing . . . as they are entitled by the terms of said treaty to the "right of taking fish at all usual and accustomed places in common with the citizens of the Territory" . . . .

Mr. Gordon's letter then refers to the case of *United States v. Taylor*, 3 Wash. Terr. 88, 13 Pac. 333 (1887), and concludes: "This case I think is is [*sic*] decisive of the privileges of the Indians mentioned to take fish at the Cascade Fisheries . . . ." It is thus clear from Gordon's report that he was informed and believed that the Cascade Indians had been members of the Yakima tribe in 1855, but later were known as the "Cascade Indians" and that the Treaty With The Yakamas included the Cascade Fisheries as a "usual and accustomed" fishing place.

The state argues that parol evidence cannot modify the treaty and since the Cascades were not listed as parties thereto, their "usual and accustomed" fishing places are not available to the Yakimas.

In this state and elsewhere, Indian treaties have given rise to a great deal of litigation. The many decided cases have established certain principles which should be kept constantly in mind in approaching the problems of this case.

(1) A treaty entered into by the United States with an Indian Nation is a part of the supreme law of the land and binding on state courts. *State v. Satiacum, supra; United States v. Taylor, supra; Hauenstein v. Lynham,* 100 U.S. 483, 25 L. Ed. 628 (1879).

(2) Treaties with Indians are to be construed liberally to protect the rights of Indians. *United States v. Winans,* 198 U.S. 371, 49 L. Ed. 1089, 25 Sup. Ct. 662 (1905); *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L. Ed. 483 (1832).

(3) Any ambiguity should be resolved in favor of the Indians. *State v. Edwards,* 188 Wash. 467, 62 P.2d 1094 (1936); *Winters v. United States,* 207 U.S. 564, 52 L. Ed. 340, 28 Sup. Ct. 207 (1908); *Jones v. Meehan,* 175 U.S. 1, 44 L. Ed. 49, 20 Sup. Ct. 1 (1899).

(4) The construction placed upon the treaty by the parties should be taken as true when such construction has been adopted and acted upon by them over a long period of years. *Pigeon River Improvement, Slide & Boom Co. v. Charles W. Cox, Ltd.,* 291 U.S. 138, 78 L. Ed. 695, 54 Sup.

Ct. 361 (1934); *United States v. Payne*, 8 Fed. 883 (W.D. Ark. 1881); *State v. Edwards, supra.*

When we consider all these factors—that the government's Indian agent sent to investigate the Indians' rights under the treaty accepted as a fact that the Cascade Fisheries was "usual and accustomed" to the Yakimas; that the Cascade Indians were a part of the Yakima tribe at the time of the treaty and may have acquired the name "Cascades" at a later date; that the Yakimas have, since the time of the treaty, fished in this area and regarded it as "usual and accustomed" and that the government has, in this case, supported the claim of the Indians, we think it fair to say that the construction placed upon the treaty by both the government and the Indians since the time of its signing, supports the trial court's finding that the Cascade Fisheries was and is a "usual and accustomed" fishing place of the Yakimas.

Nor does this construction do violence to the parol evidence rule, for, under the evidence in this case, it is not certain that the Indians fishing at the Cascade Fisheries in 1855 used the name Yakimas, Cascades or some other name.

The case of *State v. Edwards, supra,* is particularly in point. The treaty there involved gave the Indians reservation land to the "low water mark." The Indians were prosecuted for building a fish trap below the "low water mark." The state contended that "low water mark" meant the average of "lower low tides" in accordance with the general understanding of the term. The Indians claimed that the meaning should be "extreme low tide." The court resolved this dispute in favor of the Indians, saying at 471-72:

> Under well-settled law laid down by the supreme court of the United States, we are bound to construe the grant contained in the treaty, as fixed by the executive order, as it would naturally be understood by the Indians.
>
> . . . .
>
> The Indians, by their continuous use of these tide lands to the extreme low water mark for the digging of clams and the like, have demonstrated their understanding of what was meant by "low water mark" and, following the

rule announced by the highest court of the land, we must hold that the judgment of the trial court follows the law as laid down by the Federal courts and is just and right.

■ The finding of the trial court that the Cascades were part of the Yakima Nation at the time of the treaty is based upon divided and somewhat unsatisfactory evidence. We, of course, will not disturb the trial court's findings when made upon conflicting evidence. The relation of the Cascades and the Yakimas at the time the treaty was signed may arise in other cases, and our decision should not foreclose the reception of evidence relating to this question and perhaps a new and different determination thereof. What the trial court did was make a finding of fact based on the evidence introduced at the trial. Neither the trial court nor this court intends that this finding of fact should be regarded as a construction of the treaty.

■ We come now to the next phase of this case, namely, are the state's restrictions on fishing reasonable and necessary to conserve the fishery? This rule was applied by this court in *Department of Game v. Puyallup Tribe, Inc.,* 70 Wn.2d 245, 422 P.2d 754 (1967); and in *State v. McCoy,* 63 Wn.2d 421, 387 P.2d 942 (1963). As stated in *Department of Game v. Puyallup Tribe, Inc.,* at 257:

> The burden of proof, once the defendant has established that he is a member of a tribe having a treaty right to take fish at all "usual and accustomed grounds and stations," is on the state to show that its regulations, which limit Indian fishing rights either as to the time or manner of fishing, are reasonable and necessary to conserve the fishery.

The above-quoted case had not been decided at the time of this trial and the then recent case of *Maison v. Confederated Tribes of the Umatilla Indian Reservation,* 314 F.2d 169, 172 (9th Cir. 1963), required the state to prove that its regulations were necessary by establishing two propositions as follows: *"first,* that there is a need to limit the taking of fish, *second,* that the particular regulation sought to be imposed is 'indispensable' to the accomplishment of the

needed limitation." The trial court announced it would follow the ninth circuit's "indispensable" rule in preference to the "reasonable and necessary" rule of *State v. McCoy, supra.* At this time the state had introduced some testimony regarding the necessity of regulating fishing at the Cascade Fisheries. However, after the court's announcement, the state moved to strike all of this testimony and the motion was granted. Subsequent to the trial, this court decided *Department of Game v. Puyallup Tribe, Inc., supra,* where the "indispensable" rule of the ninth circuit was rejected in favor of the "reasonable and necessary" rule which had earlier been adopted in *State v. McCoy, supra.*

Since the state's evidence was stricken and no offer of proof was made, this court has nothing before it to indicate that RCW 75.12.060, as applied to the respondents, was reasonable and necessary for preservation of the fisheries.

In future cases the burden remains on the state to present testimony under the "reasonable and necessary" rule to demonstrate that its regulation of Indian fishing is in keeping with the guideline quoted from the *Puyallup* case, *supra,* which case, together with *McCoy, supra,* is the law of this state and to be followed by trial courts unless overruled by the United States Supreme Court.

██ ██ Lastly, the state contends that the Columbia River Compact, 40 Stat. 515, entered into between Washington and Oregon and approved by an act of Congress in 1918, alters or abrogates the rights of Indians to fish at their "usual and accustomed" fishing places. Assuming arguendo that a treaty between the United States and an Indian Nation may be modified by a congressionally approved compact between the states, we think it is clear that this compact does not purport to change or modify Indian rights in any way. An intention to alter or abrogate a substantial right created by an Indian treaty will not lightly be attributed to Congress. *Anderson v. Gladden,* 293 F.2d 463 (9th Cir. 1961). The compact is merely an agreement by the two states that neither, without the consent of the other, will change its fishing laws regulating fishing in

those portions of the Columbia River over which they exercise concurrent jurisdiction.

Under the facts submitted to the trial court, the case was properly dismissed. The judgment is therefore affirmed.

FINLEY, C. J., HILL, WEAVER, and ROSELLINI, JJ., concur.