[No. 36224.   En Banc.   December 19, 1963.]

THE STATE OF WASHINGTON, *Appellant*, v. JOE McCOY, *Respondent*.*

*Reported in 387 P. (2d) 942.

*Walter J. Deierlein, Jr.* and *Paul N. Luvera, Jr.*, for appellant.

*Harwood Bannister*, for respondent.

*The Attorney General, Stephen M. Reilly* and *Joseph L. Coniff, Assistants*, amici curiae.

ROSELLINI, J.—This case involves the question of whether the state can enforce reasonably necessary regulations for the conservation of chinook salmon fisheries against an Indian whose tribe was a party to the Treaty of Point Elliott, 12 Stat. 927 (January 22, 1855).

Defendant, an American Indian of Swinomish descent, was charged with fishing in closed waters. The trial court acquitted him, holding that the Treaty of Point Elliott granted him immunity from state regulatory powers. The state appeals.

In the early morning hours of July 28, 1960, defendant was fishing from his boat in what is called the "jetty drift" located near the mouth of the north fork of the Skagit River. He was operating an 18-foot, 25-hp-outboard-motor boat, and was using a 600-foot modern nylon gill net. One end of the net was attached to his boat; the other end extended horizontally 600 feet. The top of the net was equipped with floats and the bottom with a lead line. The net, thus, was held perpendicular in the water and the mesh was deep enough to drag the bottom of the river. The defendant would commence in the upper reaches, and drift with the tide to the end of the jetty. This procedure would be repeated. The effect was to sweep the jetty clean of fish. The defendant's catch of salmon was for sale to commercial buyers.

The jetty drift is a commercial fishery which has been enjoyed in common by the Indians and non-Indians for a period of many years. About 1959, the Swinomish Indians asserted that they could fish unregulated at the jetty drift.

The regulation in effect at the time of the defendant's arrest was not a permanent prohibition of fishing. It was a 10-day closure designed to protect the peak of the salmon

runs passing through the Skagit River to the spawning grounds.

Salmon migrate through many fisheries. Time closures, therefore, are staggered to protect the fish as they make their way through each fishery situated on the path of migration. This 10-day closure on the Skagit River was closed to all fishing. Defendant asserts his immunity to the closure regulation because of Art. 5 of the Treaty of Point Elliott:

"The right of taking fish at usual and accustomed grounds and stations is further secured to said Indians in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing, together with the privilege of hunting and gathering roots and berries on open and unclaimed lands. Provided, however, that they shall not take shell-fish from any beds staked or cultivated by citizens." (Treaty with the Dwamish, Suquamish, etc., 1855, 12 Stat. 927).

The court found that the respondent was not fishing within the boundaries of the reservation, but was fishing at the usual and accustomed fishing grounds.

The 24 assignments of error raise two issues (1) whether the state can show that regulation is reasonably necessary to conserve a fishery resource, and (2) whether it has been preempted by the Treaty of Point Elliott from any state action in regard to Indian fishing rights.[1]

It is contended by the respondent that the Treaty of Point Elliott reserves to Indians the unrestricted right to

[1] Basically, the same questions were before this court in *State v. Satiacum*, 50 Wn. (2d) 513, 314 P. (2d) 400, but no definitive answers were given. An addendum by Chief Justice Hill, at p. 538, states:

"The eight judges who heard the *En Banc* argument on this case on February 13, 1957 (Judge Weaver being incapacitated at that time), are agreed that the order of the trial court dismissing the charges against the two defendants should be affirmed, but they are in disagreement as to the reason for the affirmance.

"Three judges have signed Judge Donworth's opinion, and three judges have signed Judge Rosellini's opinion, and there is no majority opinion. It therefore follows that the cases which Judge Donworth's opinion states are overruled, are not in fact overruled, and nothing is decided except that the order dismissing the charges against the defendants is affirmed."

fish. Therefore the reasonableness of any regulation is an irrelevancy. The law is otherwise when applied to treaty Indians fishing off of the reservation at the usual and accustomed grounds.

In *Tulee v. Washington*, 315 U. S. 681, 86 L. Ed. 1115, 62 S. Ct. 862 (1942), the court ruled that the state might regulate the time and manner of off-reservation fishing by Indians where necessary for conservation.

" . . . The appellant [Tulee], on the other hand, claims that the treaty gives him an unrestricted right to fish in the 'usual and accustomed places,' free from state regulation of any kind. We think the state's construction of the treaty is too narrow and the appellant's too broad; that, while the treaty leaves the state with power to impose on Indians, equally with others, such restrictions of a purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish, it forecloses the state from charging the Indians a fee of the kind in question here."

The United States Supreme Court reaffirmed this ruling in *Organized Village of Kake v. Egan*, 369 U. S. 60, 75, 7 L. Ed. (2d) 573, 82 S. Ct. 562:

" . . . Even where reserved by federal treaties, off-reservation hunting and fishing rights have been held subject to state regulation, *Ward v. Race Horse*, 163 U. S. 504; *Tulee v. Washington*, 315 U. S. 681, in contrast to holdings by state and federal courts that Washington could not apply the laws enforced in *Tulee* to fishing within a reservation, [citing authorities].

"True, in *Tulee* the right conferred was to fish in common with others, while appellants here claim exclusive rights. . . ."

In *Makah Indian Tribe v. Schoettler*, 192 F. (2d) 224 (C. A. 9th, 1951), the court held that the state had not proved the necessity of a regulation limiting gear in the Hoko River to hook and line. In the course of the opinion, the court observed that the resource might be equally well conserved by permitting a fishery with periodic closures.

In the case of *Maison v. Confederated Tribes of Umatilla Indian Reservation*, 314 F. (2d) 169 (C. A. 9th, 1963), the court said:

"Thus, in both the Tulee and Makah cases it was held that the Indians' right to fish is qualified by the state's right to regulate such fishing when necessary for conservation. But, to establish necessity the state must prove two facts: *first*, that there is a need to limit the taking of fish, *second*, that the particular regulation sought to be imposed is 'indispensable' to the accomplishment of the needed limitation."

Of interest is the Indian Claims Commission decision which is not published, but is on microfilm at the University of Washington Library, and has been transcribed and made available to this court. That is the case of *Makah Indian Tribe v. United States*, 7 Ind. Cl. Comm. 477 (1959) affirmed 151 Ct. Cl., docket No. 559, unpublished, cert. den. 365 U. S. 879, 6 L. Ed. (2d) 191, 81 S. Ct. 1028 (1961). There compensation was sought for the alleged impairment of the treaty-fishing right by regulation. The treaty provision was similar to that in the instant case. The commission ruled, p. 507:

"By entering into international agreements with Canada to conserve, protect and restore the depleted Pacific halibut ocean fishing, the United States did not deprive, abrogate, or deny to the Makah Tribe of Indians any right which they may have reserved under Article IV of the 1855 Makah Treaty to fish in common with all citizens of the United States at usual and accustomed grounds and stations because:

"(1) Such fishing rights as guaranteed under Art. IV of the 1855 Makah Treaty are not so absolute, unlimited, and exclusive in that they cannot be accommodated and adjusted to meet changing circumstances where the Government must impose reasonable regulations designed to conserve and protect our natural resources for the benefit of all. *Tulee v. State of Washington*, 315 U. S. 1081 (1942), *Makah Indian Tribe v. Schoettler*, 192 F. 2d 244 (1951); and

"(2) The defendant has shown by overwhelming evidence (for the most part undisputed) that the seasonal restrictions, imposed upon the Pacific coast halibut fishery by regulations promulgated and adopted by the International Fisheries Commission, pursuant to the Convention between Canada and the United States, are fair, reasonable, and absolutely necessary to conserve, protect, and rehabilitate the halibut species. . . .

"(3) The reserving of Makah fishing rights at usual and accustomed places under the 1855 Treaty was founded upon the need of the petitioner tribe to maintain its then subsistence economy which was based primarily upon the immediate products of the sea, and in no sense was this treaty provision a guarantee of future commercial fishing rights.

"(4) Petitioner has failed to prove that in complying with the regulations of the halibut Commission, or by their enforcement, the individual members of petitioner tribe suffered a deprivation to the extent that they are unable to sustain their immediate wants or that of their families consistent with a subsistence economy."

To ascertain whether regulation is reasonably necessary for conservation of Pacific salmon, one must understand the life cycle of these fish.

Pacific salmon are anadromous fish; that is, they are hatched in fresh water, descend to salt water, attain most of their growth there, and then return to the stream of their origin to spawn and perpetuate their kind. After spawning, they die. They have a well-developed homing instinct that enables them to return to spawn in the stream of their origin. Spawning occurs in the fall and winter in well-percolated gravel beds, where the fish bury their eggs to protect them from predators and the elements. The eggs hatch in the gravel and the fish live there for a time, subsisting on the yoke material from the egg. After emerging from the gravel, the young fish begin to swim actively. Depending on the species, some salmon spend a year or more in fresh water before migrating to sea, while others leave for ocean environment within a few weeks or months after emerging from the gravel of the nest. Three to five years later, the chinook salmon return from the sea to the river of their birth to spawn.

After the various species of salmon near maturity and are in prime condition, they leave the extensive pastures of the sea to begin the long journey to the home stream of their origin. It is during this period of the salmon's life that the main effort toward harvest is concentrated. While still at sea the chinook, silver, and pink salmon are caught by the commercial and sports trollers off the coasts of

Alaska, British Columbia, Washington, Oregon, and California. After these species enter the inside waters off the mouths of their spawning streams, their numbers are further reduced by net fisheries.

When the survivors escape the last net fishery in the rivers of their birth, they deposit their eggs in the gravel to perpetuate their kind, complete the life cycle and die.

The appellant proffered testimony to show the number of other Indians fishing, their manner of fishing, and the effect of such fishing. It offered proof of the effect on salmon runs of unrestricted fishing. It offered charts and testimony with regard to catch versus escapement of chinook and silver salmon in the Puyallup River, showing how an unregulated Indian fishery affects conservation, and the necessity for regulation to conserve salmon runs. This evidence disclosed that prior to 1953, there did not exist any Indian fishery on the Puyallup River. During the year 1953 there were three Indian nets, and by 1960, there were some 30 gill nets and numerous set nets on the Puyallup. Exhibit No. 14 illustrates graphically what occurs when unrestricted fishing is permitted. It shows the catch record of only a few fish in 1953 and more than 14,000 fish in 1960. While, the escapement record shows approximately 13,000 fish in 1953 and less than 1,800 fish in 1960. As the catch increased, the escapements decreased so that a point of extinction will be reached should the cycles of salmon all be subject to unrestricted fisheries.

The offered evidence was rejected. This was error.

One essential of a conservation program is the regulation of the harvest of salmon in salt- and fresh-water areas. It is regulation that provides the escapement necessary to maintain a perpetual supply of salmon for the harvest by all people. If a fishery, within a river or off its mouth, harvests too many of the adult salmon because of the shallow confined nature of the fishing area and the habits of the salmon which cause them to school up and delay in these areas prior to ascending the river, there will be little escapement to perpetuate the runs. An uncontrolled fishery in such areas may harvest almost the entire run

of a fishery resource. Salmon are not inexhaustible and without their proper escapement for reproduction from year-to-year through controls in the harvest, the stocks will be reduced to a point where only a remnant run will exist.

Experience has shown that for runs of chinook salmon returning to a river, there are limits within which the harvest must be kept if sufficient seed stock is to reach the spawning grounds to maintain the runs. For chinook, a catch of 40 to 50 per cent of the total run is estimated to be within the necessary limits.

The Skagit River is capable of handling approximately 60,000 to 75,000 chinook spawners. Surveys in 1952 showed escapement of only 20,000 adult fish, and these continued to drop until, in 1957, the escapement of chinook in the Skagit River was down to 10,000. To stop the decline, regulations were imposed restricting fishing time, until in 1960, approximately 30,000 escaped and spawned in the Skagit. It has been demonstrated that unrestricted gill net fishing on the Fraser River could take 98 per cent of the runs. Similar results have been obtained on the Columbia River.

The state had a right to show that the number of fishermen fishing the jetty drift could take a major portion of the returning salmon. It is suggested that if greater regulation had been imposed upon the harvest of salmon in the ocean and in waters other than the Skagit River, that Indians could fish unmolested. This is contrary to the scientific proof. It has been demonstrated in places both on the Columbia and Fraser rivers that the regulation of one form of gear has not in reality saved any fish for spawning purposes, but instead has provided additional catch to the last fishery on the road of migration.

Edward M. Mains, supervisor of the Research Division of the state Department of Fisheries, established the relation between regulation and conservation, as follows:

"Q. You mentioned previously time, manner and place so far as the regulation of fishing was concerned. Would you tell us the importance of regulating the time of fishing so far as the conservation of salmon as a resource is concerned?

"A. Yes. The control over time of fishing is one of the best tools we have in conservation work. During the time the salmon are migrating from the sea to their — this applies especially, I should say, to migrating fish, because over the years we have collected information and we have quite complete information on when these runs pass through certain areas and we know the time that they are in this area. So that by restricting the number of days of fishing it is fairly easy to actually conserve fish to spawn. We can actually do this by areas. We know the fish come through the outer straits areas at a certain time and in approximately a week later they are in another area, and a week further they are closer to the spawning grounds. We can stagger the closed seasons in this area to protect this entire group of fish. For instance, if you effect a ten-day closure out in the straits somewhere you would have to consider travel time —

"Q. —Excuse me one moment. What is the travel time of the average fish?

"A. It varies. From the time they cease feeding and start moving toward their home stream it varies from ten to twenty miles a day. This has been borne out by tagging studies. From the actual time when the tag was placed on the fish and released and time it was recovered we know the actual number of miles it covered in certain days.

"Q. Thank you. I did not mean to interrupt.

"A. Anyway, by following these certain groups of fish, by taking care of the fish in the peak of the run, by staggering the closures as it goes in you can protect this group of fish. This is the real prime principle you try to do. In other words, there is no use in trying to curtail fishing for ten days out in the Sound some place if you are going to let this same fishery catch these same fish you saved out there. In other words, you haven't accomplished your intention of getting this same fish up to the spawning grounds. You have saved this group of fish from this one fishery and you let them be caught by another. This has been demonstrated time and time again in the Columbia River fisheries and Fraser River fisheries where unlimited and unrestricted gill net fishery can take ninety-five to ninety-eight percent of the fish. Unless you effectuate staggered closures up the river you can't really save the salmon from one year to another year.

"Q. In other words, this time closure on fishing is necessary for the conservation of salmon throughout the State of Washington.

"A. Very definitely. If you don't actually design the closures correctly so that they are compatable with the time movement of the fish, and if you don't have everybody observing the closures that you set, why, then you effectively have no regulation or only partial regulation."

This same witness concluded that a few individual fishermen, unregulated by the department, could destroy the run:

"Q. What would your opinion be, sir, as the effect of conservation, if you have one or a few individuals unregulated so far as the Skagit River is concerned?

"A. Well, you could definitely destroy the run by the same illustration which I mentioned here. It has been demonstrated, for instance, that unrestricted fishing on the Fraser River by their gill net fishery could take ninety-eight percent of the run. It has been demonstrated by studies on the Columbia River that unregulated fishery there has the ability to take ninety-five percent of the run, and we also have the rather recent illustration in the case of the Puyallup River Indian fishery where they have virtually destroyed that run and are in the process of doing so with unregulated fishery."

This evidence if considered by the court would have proved that regulation was reasonably necessary to conserve chinook salmon runs in the Skagit River.

The reason for the great increase in the Indian fishery and its attendant conservation problems, is because of the skyrocket values of salmon. An adult chinook salmon will weigh from 15 to 45 pounds, and some have weighed as much as 82 pounds. The average weight in a catch is anywhere between 18 to 22 pounds. The average wholesale price for chinook salmon is $10 per fish. With such an economic bonanza, just for the taking, individual self-restraint is a poor substitute for proper state regulation. Without state action to permit enough seed stock to escape to spawn, salmon will face extinction.

The trial court held that the Treaty of Point Elliott granted the Indians an unrestricted right to fish. This decision was based upon the reasoning of Indian "water rights" cases.

The "water rights" cases are distinguishable in that they involve the *on reservation* use of water, which was neces-

sary for the agricultural development of Indian lands. It was the policy of Congress to integrate the various Indian tribes eventually into the agrarian level of our economy. *Conrad Inv. Co. v. United States*, 161 Fed. 829, 831 (C.C.A. 9th, 1908); United States Department of Interior, Federal Indian Law, 225-230 (1958).

*Pioneer Packing Co. v. Winslow*, 159 Wash. 655, 294 Pac. 557 (1930), is not contrary to this view. That case involved the Indians' right to fish on the reservation, as is clearly shown by the statement of the court on page 662:

"In the case of *State v. Towessnute*, 89 Wash. 478, 154 Pac. 805, there was involved the right of the Yakima Indians to catch fish in violation of the state law outside of the reservation. The question of their right to catch fish within the reservation was not involved in that case, and it has no application here."

To say that, by analogy, the Indians have a right to go outside their reservation to their "usual and accustomed grounds" to fish free of any regulation, amounts to an unwarranted extension of the rationale of the "water rights" cases. *United States v. Fallbrook Public Util. Dist.*, 165 F. Supp. 806, 838 (1958), forcibly demonstrates that the "water rights" theory is not to be extended by analogy.

An examination of the Point Elliott treaty discloses that the Indians ceded the lands to the United States. They reserved lands for Indian reservation purposes, and reserved 36 sections of land for the purpose of establishing an agricultural and industrial school for the Indians. In consideration for the land, the United States was to pay $150,000; and an additional $15,000 was granted for expenses of removal and settlement of the Indians on the reservation, and to provide for the breaking and clearing of land for cultivation, and for fencing the same.

The United States was also to establish schools and to provide instructors, and to furnish mechanical shops.

By Art. 9 of the treaty, the tribes and bands acknowledge their dependence on the government of the United States, and promise to preserve friendly relationships with all citizens and with other Indian tribes.

The Indians of Puget Sound, unlike those of the upper Columbia (Yakima and Nez Perce) were remnants of former large tribes; their numbers were depleted by small-pox and other diseases. These tribes were docile and were subjected to raids by the Haida and Tlingit of British Columbia and Alaska and by the Yakima from Eastern Washington. In addition to these difficulties, the settlers were fencing the gathering places, and, when objection was made by the Indians, they were told that the Great Father would pay for the lands. Existing under these conditions, the Indians appeared to welcome the messages from Governor Stevens which promised them protection and a way of bettering their lot by providing reservations for their use and even a means of imitating the white settlers. *The Life of Isaac Ingalls Stevens*, by his son, Hazard Stevens (1901) Vol. 1, 451-459. Under such circumstances, Art. 9 of the treaty of Point Elliott, by which the Indians acknowledge dependence upon the government, becomes more meaningful.

In the light of the governmental policy to set aside farming areas for the Indians and the condition of these tribes at the time of the treaty, the reason for Art. 5 is clarified. Governor Stevens was commissioned to carry out a governmental policy intended to protect and provide for their ultimate civilization and a place in the community. The Indians' condition was such that they welcomed the opportunity to have a place set aside for themselves.

But the project of instructing the Indians so that they would be self-sustaining would take years. The treaty itself had to be ratified. Unless the Indians were permitted to leave the reservation to pursue their gathering culture, they would starve.

In *The Life of Isaac Ingalls Stevens, supra,* p. 454, the author states that while in Olympia, the Governor outlined the provisions to be included in the Puget Sound treaties. With reference to the reason for the fishing provision, he says:

"7. As the change from savage to civilized habits must necessarily be gradual, they were to retain the right of

fishing at their accustomed fishing-places, and of hunting, gathering berries and roots, and pasturing stock on unoccupied land as long as it remained vacant."

A similar account is given in *The Northwest Coast; or, Three Years' Residence in Washington Territory* (1857), by James G. Swan, p. 344:

" . . . The Indians, however, were not to be restricted to the reservation, but were to be allowed to procure their food as they had always done, and were at liberty at any time to leave the reservation to trade with or work for the whites."

Article 5 does not relate to fishing alone. It obviously relates to the Indians' gathering culture at the time of the treaty; the right to gather roots and berries, pasture their horses, and to fish.

Article 5 is limited: The right to fish was limited to a right "in common" with other citizens and to the usual and accustomed places. Only temporary houses for curing were to be constructed at such places; the gathering of roots and berries, and hunting could be conducted only on open and unclaimed lands, and shellfish could not be taken from beds staked or cultivated by citizens.

Governor Stevens' representation was that a means would be afforded for the Indians to obtain food during the transition period to a civilized life as farmers. There was no intention to limit governmental powers and there was no need to discuss governmental powers. The United States had purchased the Indian lands but secured to them the limited right to go on those lands to obtain food consistent with their needs at that particular time.

■ The decisional law arising from Indian claims leads to the conclusion that the treaty secured to the Indians a servitude, or easement, upon the land at their usual and accustomed places. This right in the soil protects the Indians from exclusion from such places by non-Indians. *United States v. Taylor*, 3 Wash. Terr. 88, 13 Pac. 333 (1887); *United States v. Winans*, 198 U. S. 371, 49 L. Ed. 1089, 25 S. Ct. 662 (1905); *Seufert Bros. Co. v. United States*, 249 U. S. 194, 63 L. Ed. 555, 39 S. Ct. 203 (1919).

But the treaties do not impair the police power of the state. *Ward v. Race Horse*, 163 U. S. 504, 41 L. Ed. 244, 16 S. Ct. 1076 (1896); *New York ex rel. Kennedy v. Becker*, 241 U. S. 556, 60 L. Ed. 1166, 36 S. Ct. 705 (1916); *Tulee v. Washington*, 315 U. S. 681, 86 L. Ed. 1115, 62 S. Ct. 862 (1942); *Makah Indian Tribe v. United States*, 7 Ind. Cl. Comm. 477 (1959).

Neither line of decisions is exclusive of the other. The interpretation of the right as one in the soil, subject to the sovereign power of the state (United States Department of the Interior, Federal Indian Law (1958) 716) is consistent with the nature of the Indians' aboriginal right in the soil, the policy of the United States in extinguishing this right by purchase, and the conditions surrounding the making of the treaty.

The relative rights of the United States and the aborigines to the soil was first established in *Johnson v. McIntosh*, 21 U. S. 543, 5 L. Ed. 681 (1823). Chief Justice Marshall distinguished between the powers of government and rights to property, stating at p. 584:

" . . . Thus, all the nations of Europe, who have acquired territory on this continent, have asserted in themselves, and have recognised in others, the exclusive right of the discoverer to appropriate the lands occupied by the Indians. Have the American states rejected or adopted this principle?

"By the treaty which concluded the war of our revolution, Great Britain relinquished all claim, not only to the government, but to the 'propriety and territorial rights of the United States,' whose boundaries were fixed in the second article. By this treaty, the powers of government, and the right to soil, which had previously been in Great Britain, passed definitively to these states. We had before taken possession of them, by declaring independence; but neither the declaration of independence, nor the treaty confirming it, could give us more than that which we before possessed, or to which Great Britain was before entitled. It has never been doubted, that either the United States, or the several states, had a clear title to all the lands within the boundary lines described in the treaty, subject only to the Indian right of occupancy, and that the exclusive power to extinguish that right, was vested in that government which might constitutionally exercise it."

■ The governmental powers of the Unted States were not derived from the Indians. The Indian right was one of use and occupancy in the soil to the extent that it is recognized by the United States. Cohen, Original Indian Title, 32 Minn. L. Rev. 28, 35 points out the distinction between a transfer of governmental power and a transfer of rights in land:

"It may help to appreciate the distinction between a sale of land and the transfer of governmental power if we note that after paying Napoleon 15 million dollars for the cession of political authority over the Louisiana Territory we proceeded to pay the Indian tribes of the ceded territory more than twenty times this sum for such lands in their possession as they were willing to sell. . . ."

The United States has consistently pursued the policy of acquiring the Indians' rights of use and occupancy by purchase rather than conquest, engaging in what was termed by President Truman as "the largest real estate transaction in history," involving more than 90 per cent of the public domain. While the United States paid 50 million dollars to Britain, Spain, France, Mexico, and Russia for claims of sovereignty based on discovery, 800 million dollars has already been paid to the Indians for their rights of use and occupancy. 32 Minn. L. Rev. 28, 34, 43, 58. Additional claims are now pending before the Indian Claims Commission.

The Treaty of Point Elliott was a part of this real estate transaction—a treaty for the purchase of real estate.

Spain had released its claim to lands north of the 42nd parallel by treaty in 1819. Russia relinquished its claims south of 54° 40′ by treaty with the United States in 1824, and Great Britain in 1825. The United States and Great Britain settled their differences in 1846, thereby leaving what is now the state of Washington open for settlement. 5 Treaties and Other International Acts of the United States of America, 1846-1852, Miller, pp. 3-5 and 11.

It is difficult to conceive that, after treating with these European nations for the governmental power and rights to the soil arising from discovery, the United States authorized

Governor Stevens to bargain away its governmental powers to the Swinomish Indian tribe and a multitude of other small tribes and bands of Indians.

By Act of March 2, 1853 (10 Stat. 172), the Washington Territory was organized out of the Oregon Territory and, by Act of July 17, 1854 (10 Stat. 305), the Oregon Donation Act (9 Stat. 496) was extended to the Territory of Washington. Thus, the Territory was opened for settlement prior to any of the Indian treaties. The United States was buying and the Indians were selling the aboriginal right of use and occupancy to the Washington Territory.

Prior to the treaties, the fee was in the United States subject to the aboriginal right of use and occupancy insofar as it is recognized. *Johnson v. McIntosh, supra;* Original Indian Title, 32 Minn. L. Rev. 28; *Tee-Hit-Ton Indians v. United States,* 348 U. S. 272, 99 L. Ed. 314, 75 S. Ct. 313 (1955), reh. den. 348 U. S. 965; *United States v. Santa Fe Pac. R. Co.,* 314 U. S. 339, 86 L. Ed. 260, 62 S. Ct. 248 (1941).

In *United States v. Winans, supra,* p. 381, the court held that by such treaty provisions, the Indians

". . . were given a right in the land—the right of crossing it to the river—the right to occupy it to the extent and for the purpose mentioned."

Such a right naturally follows from the recognition by the United States of the existence of aboriginal Indian title and the acquisition of that right by purchase. The court further stated at p. 384:

"The extinguishment of the Indian title, opening the land for settlement and preparing the way for future States, were appropriate to the objects for which the United States held the Territory. And surely it was within the competency of the Nation to secure to the Indians such a remnant of the great rights they possessed as 'taking fish at all usual and accustomed places.' Nor does it restrain the State unreasonably, if at all, in the regulation of the right. *It only fixes in the land such easements as enables the right to be exercised.*" (Italics ours.)

The United States may grant such rights in the soil while lands are held in territorial status without conflict with the subsequent admission of states upon equal footing.

*United States v. Winans, supra*; *Shively v. Bowlby*, 152 U. S. 1, 48, 38 L. Ed. 331, 14 S. Ct. 548 (1894); *Stearns v. Minnesota*, 179 U. S. 223, 45 L. Ed. 162, 21 S. Ct. 73 (1900); and *Organized Village of Kake v. Egan*, 369 U. S. 60, 7 L. Ed. (2d) 573, 82 S. Ct. 562 (1962).

The State of Washington was admitted into the Union upon equal footing with the original states. Enabling Act, § 8, chapter 180, 25 Stat. 676, 678. By such admission, it became entitled to exercise all of the powers of government enjoyed by the original states of the Union. *Coyle v. Smith*, 221 U. S. 559, 55 L. Ed. 853, 31 S. Ct. 688 (1911); Constitution of the United States of America, Sen. Doc. No. 170, 82nd Cong. 2d Sess., 1952, Corwin. The power to protect fish and game is an inherent attribute of the sovereign power of a state. *Geer v. Connecticut*, 161 U. S. 519, 40 L. Ed. 793, 16 S. Ct. 600 (1896); *Ward v. Race Horse, supra*.

While the United States had the power to impair a state's police power by treaty, *Missouri v. Holland*, 252 U. S. 416, 64 L. Ed. 641, 40 S. Ct. 382 (1920), the language of a treaty wherever reasonably possible will be construed so as not to override state laws or impair rights arising under them. *Guaranty Trust Co. v. United States*, 304 U. S. 126, 143, 82 L. Ed. 1224, 58 S. Ct. 785 (1938).

There must be a clear and unequivocal expression of congressional will by Congress if state powers are to be preempted. *Cohens v. Virginia*, 19 U. S. 264, 443, 5 L. Ed. 257 (1821); *Reid v. Colorado*, 187 U. S. 137, 47 L. Ed. 108, 23 S. Ct. 92 (1902). Here, there is no express limitation of governmental powers in the treaty and no expression of congressional will which in any way conflicts with state law. In the absence of a clear conflict, state law must prevail.

But it is argued that all doubts must be resolved in the Indians' favor and that the application of this rule requires that the treaty be construed as a limitation of the police power.

Of this rule the court said, in *Northwestern Bands of Shoshone Indians v. United States*, 324 U. S. 335, 353, 89 L. Ed. 985, 65 S. Ct. 690 (1945):

" . . . But the context [of the original statement] shows that the Justice meant no more than that the language should be construed in accordance with the tenor of the treaty. That, we think, is the rule which this Court has applied consistently to Indian treaties. We attempt to determine what the parties meant by the treaty. We stop short of varying its terms to meet alleged injustices. . . ."

Further, the rule that such treaties should be construed so as to uphold the sanctity of the public faith will not permit a state to be stripped of an essential attribute of its governmental existence by implication and deduction and

" . . . should not be made an instrument for violating the public faith by distorting the words of a treaty, in order to imply that it conveyed rights wholly inconsistent with its language and in conflict with an act of Congress, and also destructive of the rights of one of the States. . . ." *Ward v. Race Horse*, 163 U. S. 504, 516.

While the court endeavors to construe such provisions as the Indians understood them, it will not construe them so as "to divide the inherent power of preservation as to make its competent exercise impossible." *New York ex rel. Kennedy v. Becker, supra.*

The intention and understanding of the Indians must be established by clear and satisfactory proof sufficient to warrant the application of this rule. *Choctaw Nation v. United States*, 121 F. Supp. 206, 211 (Ct. Cl. 1954).

The treaty secured to the Indians an interest in land, consisting of an easement, which secured to them the right *not* to be excluded from their usual and accustomed fishing grounds by non-Indians. Those cases which recognize this right and protect the Indian from such exclusion do not hold that a state may not subject the Indians to reasonable and necessary regulations in the exercise of these rights, for the protection of the fishery resource.

Upon admission to the Union upon equal footing, this state acquired all of the sovereign powers of the original states, including the power to preserve its natural resources, and it cannot be stripped of this power by implication and deduction.

For the reasons herein stated, the judgment of the trial court is reversed and the state is granted a new trial.

FINLEY, WEAVER, HUNTER, and HAMILTON, JJ., concur.

HILL, J. (concurring in the result)—I concur in the result of the majority opinion.

I agree with the dissent in principle, but with an exception on which I will hereafter enlarge which, for me, takes the present case without the protection of the treaty.

I disagree with the majority's position that for certain specified periods of time the right of the treaty beneficiaries can be suspended under the state's regulatory powers.

The rights of the Indians to fish by the methods and with the gear in use at the time of the treaty cannot be suspended or abridged. Had the defendant, Joe McCoy, been so fishing the state would have had no right to interfere with his activities.

However, none of the signatories to the treaty contemplated fishing with a 600-foot nylon gill net, which could prevent the escapement of any fish up the river for spawning purposes. (See discussion in Judge Finley's concurring opinion in *State v. Satiacum* (1957), 50 Wn. (2d) 513, 535 *et seq.*, 314 P. (2d) 400, 412 *et seq.*

I would not limit the type of gear used by an Indian when he is exercising the right to fish that anyone else is entitled to exercise; but where his right to fish "at all accustomed grounds and stations" *rests solely on his treaty rights*, then he should be limited to the gear and implements with which the treaty signatories were accustomed.

I would grant the state a new trial.

OTT, C. J. concurs with HILL, J.

DONWORTH, J. (dissenting)—The scholarly discussion by the majority concerning the very important issue presented by this case makes no mention of our most recent decision dealing with the subject of the impact of the Indian treaties on the police power of the state to regulate fishing by tribal Indians "at all usual and accustomed grounds and stations."

In *State v. Satiacum*, 50 Wn. (2d) 513, 314 P. (2d) 400 (1957), there were two opinions, each of which had the concurrence of four judges. In the first opinion, many of the decisions of the United States Supreme Court (some of which are cited in the majority opinion in this case) were discussed at length. The result of the first opinion (which was concurred in only as to the result by the four judges who signed the second opinion) was to affirm the trial court's dismissal of certain charges against two Puyallup Indians based on alleged violations of the provisions of RCW 75.12 (and regulations promulgated pursuant thereto). The defendants in that case had been fishing with nets on the Puyallup River within the city limits of Tacoma. It was stipulated that one net was within the limits of the Puyallup Indian Reservation and that the other was at a usual and accustomed fishing ground of the Puyallup tribe as provided in the 1855 treaty of Medicine Creek.

The first opinion held that the statutes involved violated the treaty. The basis for this holding was the result of an extensive review of many decisions of the Supreme Court of the United States (including *Tulee v. Washington*, 315 U. S. 681, 86 L. Ed. 1115, 62 S. Ct. 862) and of other appellate courts construing Indian treaties and treaties with foreign nations, which have been held to be the supreme law of the land under Art. 6 of the United States Constitution. In the first opinion it was stated:

"The courts have generally recognized that the treaty right of fishing at 'usual and accustomed places' was given to the Indians to provide for their subsistence and as a means for them to earn a livelihood. *United States v. Winans, supra* [198 U. S. 371]; *Makah Indian Tribe v. Schoettler, supra* [192 F. (2d) 224]; *State v. McClure, supra* [127 Mont. 534]. Applying a liberal—and not a strained— construction to the treaty of Medicine Creek as a whole, it is our opinion that the Puyallup Indians so understood Article III of the treaty, and that neither the Indians nor the United States intended that the states would or could enforce general regulations against the Indians 'equally with others' or 'in common with all citizens of the Territory' and thereby deprive them of their right to hunt and fish in

accordance with the immemorial customs of their tribes. As we interpret the treaty, we believe that the phrase 'in common with all citizens of the Territory' merely granted the white settlers and their heirs and/or grantees a right to fish at these places with the Indians, but that the Indians thereby reserved their right to fish at these places irrespective of state regulation, so long as the right shall not have been abrogated by the United States.

"No other conclusion would give effect to the treaty, since to hold that their right was *equal* to that of the citizens of the territory would be to say that they were given no right at all, except that which any citizen subject to state statutes and regulations may enjoy to fish at the 'usual and accustomed grounds and stations.' This interpretation would permit the state to abrogate their treaty rights at will.

"We are convinced that, under the applicable decisions of the supreme court of the United States referred to herein, the statutes and regulations in the case at bar are in conflict with the treaty provisions, constitute an interference with matters that are within the exclusive scope of Federal power and, therefore, cannot be held valid as to the Puyallup Indians, in relation to their right to fish 'at all usual and accustomed fishing grounds and stations.'

" . . .

"To summarize, the treaty of Medicine Creek of 1855 is the supreme law of the land and, as such, is binding upon this court, notwithstanding any statute of this state to the contrary, and its provisions will continue to be superior to the exercise of the state's police power respecting the regulating of fishing at the places where the treaty is applicable until:

"(1) the treaty is modified or abrogated by act of Congress, or

"(2) the treaty is voluntarily abandoned by the Puyallup tribe, or

"(3) the supreme court of the United States reverses or modifies our decision in this case."

I still adhere to the views expressed in the first opinion for the reasons hereinafter stated.

The basis for the concurrence in the result in the *Satiacum* case by the four judges who signed the second opinion is stated in the last paragraph thereof as follows:

"The trial court decided this case against the state on the ground that the state had failed to sustain the burden of

proving that the regulation was reasonable and necessary or rather, that the enforcement of the regulation against the defendants was reasonable and necessary for the preservation of fish. In doing so, the court adopted the holding of *Makah v. Schoettler, supra.* It is the general rule that such a regulation is presumed to be valid and the burden of proving its invalidity is upon the party challenging the regulation. The court, however, felt that in such a case as this—where the enforcement of the regulation, if not reasonable and necessary, would infringe a treaty right of the Indian—the burden should be upon the state to show that the violation of the regulation by the Indian threatens the conservation program. I would uphold the trial court in its disposition of the cause, for it is true that the state made no attempt to show that the conservation program was seriously affected by the fishing activities of the defendants or of the Indians generally. But I would not go further, as the majority has, to say that the treaty intended that the state may never interfere with fishing by Indians in their usual and accustomed places, no matter how wasteful and destructive their fishing may be. Such a holding is unnecessary to a decision of the case. Furthermore, I think it is unwarranted under the facts and the law."

Thus, this court, in 1957, upon the concurrence of eight judges, upheld the dismissal by the trial court of similar charges against treaty Indians. I think that our two opinions in the *Satiacum* case should not be ignored in deciding the present case. At least, if the first opinion is to be wiped off the books, it should be made a matter of record and not done *sub silentio.*

The majority rely on two recent decisions of the United States Supreme Court which discuss the fishing rights of nontreaty Indians in Alaska. They are *Metlakatla Indian Community v. Egan,* 369 U. S. 45, 7 L. Ed. (2d) 562, 82 S. Ct. 552 (1962), and *Organized Village of Kake v. Egan,* 369 U. S. 60, 7 L. Ed. (2d) 573, 82 S. Ct. 562 (1962). These cases, being the only expression of the Supreme Court on the subject of Indian fishing rights since our decision in the *Satiacum* case (which was decided in 1957), should be reviewed in some detail.

The *Metlakatla* case was an appeal from the decision of the Alaska Supreme Court (Alaska, 362 P. (2d) 901) which

affirmed the denial of an injunction which would have prevented the state of Alaska from interfering with the Metlakatlas' use of certain fish traps near the Annette Islands. These fish traps had been used by the Indians for many years to catch salmon pursuant to regulations promulgated by the Secretary of the Interior long prior to statehood. A statute enacted by the Alaskan legislature in 1959 prohibited the use of fish traps of the type used by these Indians. It is to be noted that the Metlakatlans were not aboriginal natives of Alaska but had migrated there from Canada in 1887. They never had a treaty with the United States. The court's decision was based on its interpretation of the act of Congress of 1891 creating the Annette Islands Reserve.

The companion case *(Organized Village of Kake v. Egan)* likewise involved the interpretation of federal statutes. It involved the fishing rights of two Indian communities chartered under the Wheeler-Howard Act of 1934. No treaty rights were involved, although the decision discusses Indian treaties at some length. This discussion is too long to quote in full in this dissenting opinion. The following excerpts indicate the court's *rationale* regarding Indian rights:

"The relation between the Indians and the States has by no means remained constant since the days of John Marshall. In the early years, as the white man pressed against Indians in the eastern part of the continent, it was the policy of the United States to isolate the tribes on territories of their own beyond the Mississippi, where they were quite free to govern themselves. The 1828 treaty with the Cherokee Nation, 7 Stat. 311, guaranteed the Indians their lands would never be subjected to the jurisdiction of any State or Territory. Even the Federal Government itself asserted its power over these reservations only to punish crimes committed by or against non-Indians. 1 Stat. 469, 470; 2 Stat. 139. See 18 U.S.C. § 1152.

"As the United States spread westward, it became evident that there was no place where the Indians could be forever isolated. In recognition of this fact the United States began to consider the Indians less as foreign nations and more as a part of our country. In 1871 the power to make treaties with Indian tribes was abolished, 16 Stat. 544, 566, 25 U.S.C. § 71. In 1887 Congress passed the General Allot-

ment Act, 24 Stat. 388, as amended, 25 U.S.C. §§ 331-358, authorizing the division of reservation land among individual Indians with a view toward their eventual assimilation into our society. In 1885, departing from the decision in *Ex parte Crow Dog,* 109 U. S. 556, Congress intruded upon reservation self-government to extend federal criminal law over several specified crimes committed by one Indian against another on Indian land, 23 Stat. 362, 385, as amended, 18 U.S.C. § 1153; *United States v. Kagama,* 118 U. S. 375. Other offenses remained matters for the tribe, *United States v. Quiver,* 241 U. S. 602.

"The general notion drawn from Chief Justice Marshall's opinion in *Worcester v. Georgia,* 6 Pet. 515, 561; *The Kansas Indians,* 5 Wall. 737, 755-757; and *The New York Indians,* 5 Wall. 761, that an Indian reservation is a distinct nation within whose boundaries state law cannot penetrate, has yielded to closer analysis when confronted, in the course of subsequent developments, with diverse concrete situations. By 1880 the Court no longer viewed reservations as distinct nations. On the contrary, it was said that a reservation was in many cases a part of the surrounding State or Territory, and subject to its jurisdiction except as forbidden by federal law, *Utah & Northern R. Co. v. Fisher,* 116 U. S. 28, 31. In *Langford v. Monteith,* 102 U. S. 145, the Court held that process might be served within a reservation for a suit in territorial court between two non-Indians. In *United States v. McBratney,* 104 U. S. 621, and *Draper v. United States,* 164 U. S. 240, the Court held that murder of one non-Indian by another on a reservation was a matter for state law.

"The policy of assimilation was reversed abruptly in 1934. A great many allottees of reservation lands had sold them and disposed of the proceeds. Further allotments were prohibited in order to safeguard remaining Indian properties. The Secretary of the Interior was authorized to create new reservations and to add lands to existing ones. Tribes were permitted to become chartered federal corporations with powers to manage their affairs, and to organize and adopt constitutions for their own self-government. 48 Stat. 984, 986, 987, 988. These provisions were soon extended to Alaska, 49 Stat. 1250.

"Concurrently the influence of state law increased rather than decreased. As the result of a report making unfavorable comparisons between Indian Service activities and those of the States, Congress in 1929 authorized the States to enforce sanitation and quarantine laws on Indian reser-

vations, to make inspections for health and educational purposes, and to enforce compulsory school attendance. 45 Stat. 1185, as amended, 25 U.S.C. § 231. See Meriam, Problem of Indian Administration (1928); H. R. Rep. No. 2135, 70th Cong., 2d Sess. (1929); Cohen, Handbook of Federal Indian Law (1945), p. 83; United States Department of the Interior, Federal Indian Law (1958), pp. 126-127. In 1934 Congress authorized the Secretary of the Interior to enter into contracts with States for the extension of educational, medical, agricultural, and welfare assistance to reservations, 48 Stat. 596, 25 U.S.C. § 452. During the 1940's several States were permitted to assert criminal jurisdiction, and sometimes civil jurisdiction as well, over certain Indian reservations. *E.g.*, 62 Stat. 1161; 62 Stat. 1224; 64 Stat. 845; 63 Stat. 705. A new shift in policy toward termination of federal responsibility and assimilation of reservation Indians resulted in the abolition of several reservations during the 1950's. *E.g.*, 68 Stat. 250 (Menominees); 68 Stat. 718 (Klamaths).

"In 1953 Congress granted to several States full civil and criminal jurisdiction over Indian reservations, consenting to the assumption of such jurisdiction by any additional States making adequate provision for this in the future. 67 Stat. 588, 18 U.S.C. § 1162, 28 U.S.C. § 1360. Alaska was added to the list of such States in 1958, 72 Stat. 545. This statute disclaims the intention to permit States to interfere with federally granted fishing privileges or uses of property. Finally, the sale of liquor on reservations has been permitted subject to state law, on consent of the tribe itself. 67 Stat. 586, 18 U.S.C. § 1161. Thus Congress has to a substantial degree opened the doors of reservations to state laws, in marked contrast to what prevailed in the time of Chief Justice Marshall."[2]

Later, in the Supreme Court's decision in the *Kake* case, the court reviews a number of decisions and federal statutes and concludes:

" . . . Even where reserved by federal treaties, off-reservation hunting and fishing rights have been held subject to state regulation, *Ward v. Race Horse*, 163 U. S. 504; *Tulee v. Washington*, 315 U. S. 681, in contrast to

[2]As recently as 1956 the United States Supreme Court, in *Squire v. Capoeman*, 351 U. S. 1, 100 L. Ed. 883, 76 S. Ct. 611, quoted with approval from Chief Justice Marshall's opinion in *Worcester v. Georgia*, 31 U. S. 350 (6 Peters 515) (1832), the rule that language used in Indian treaties should never be interpreted to their prejudice.

holdings by state and federal courts that Washington could not apply the laws enforced in *Tulee* to fishing within a reservation, *Pioneer Packing Co. v. Winslow,* 159 Wash. 655, 294 P. 557; *Moore v. United States,* 157 F. 2d 760, 765 (C.A. 9th Cir.). See *State v. Cooney,* 77 Minn. 518, 80 N. W. 696.

"True, in *Tulee* the right conferred was to fish in common with others, while appellants here claim exclusive rights. But state regulation of off-reservation fishing certainly does not impinge on treaty-protected reservation self-government, the factor found decisive in *Williams v. Lee.*[3] Nor have appellants any fishing rights derived from federal laws. This Court has never held that States lack power to regulate the exercise of aboriginal Indian rights, such as claimed here, or of those based on occupancy. Because of the migratory habits of salmon, fish traps at Kake and Angoon are no merely local matter."

I think it appropriate at this point to consider the holding in the *Tulee* case (7 Wn. (2d) 124, 109 P. (2d) 280 (1941)), which is cited in the foregoing quotation.

In that case, a member of the Yakima tribe of Indians was charged with having caught salmon with a dip bag net and with selling such fish commercially without having obtained a fishing license (costing $5) as required by statute. The place where the offense was alleged to have been committed was at one of the usual and accustomed ancient fishing places of the tribe referred to in the treaty of June 9, 1855 (12 U. S. Stat. 951). The defendant was convicted and appealed to this court, which held (by a vote of 5 to 3) that the treaty right to fish at such places was subject to the statutes of the state governing the taking of fish. In effect, the majority of this court held that the police power of the state was supreme and that the treaty-making power of the Federal Government was subordinate thereto in respect to fishing regulations.

---

[3] In *Williams v. Lee,* 358 U. S. 217, 3 L. Ed. (2d) 251, 79 S. Ct. 269 (1959), the Supreme Court, in referring to the authority of Indian tribes over their reservations said:

". . . The cases in this Court have consistently guarded the authority of Indian governments over their reservations. Congress recognized this authority in the Navajos in the Treaty of 1868, and has done so ever since. If this power is to be taken away from them, it is for Congress to do it. *Lone Wolf v. Hitchcock,* 187 U. S. 553, 564-566."

The Indian whose conviction was thus affirmed appealed to the United States Supreme Court, where the decision of this court was reversed. *Tulee v. Washington,* 315 U. S. 681, 86 L. Ed. 1115, 62 S. Ct. 862 (1942). The supremacy of the treaty right of Yakima Indians to fish at their usual and accustomed places over the power of the state to exact a $5 fishing license was recognized by the Supreme Court in the following quotation from its opinion, at page 684:

"In determining the scope of the reserved rights of hunting and fishing, we must not give the treaty the narrowest construction it will bear. In *United States v. Winans,* 198 U. S. 371, this Court held that, despite the phrase 'in common with citizens of the Territory,' Article III conferred upon the Yakimas continuing rights, beyond those which other citizens may enjoy, to fish at their 'usual and accustomed places' in the ceded area; and in *Seufert Bros. Co. v. United States,* 249 U. S. 194, a similar conclusion was reached even with respect to places outside the ceded area. From the report set out in the record before us, of the proceedings in the long council at which the treaty agreement was reached, we are impressed by the strong desire the Indians had to retain the right to hunt and fish in accordance with the immemorial customs of their tribes. It is our responsibility to see that the terms of the treaty are carried out, so far as possible, in accordance with the meaning they were understood to have by the tribal representatives at the council, and in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people. *United States v. Kagama,* 118 U. S. 375, 384; *Seufert Bros. Co. v. United States, supra,* 198-199.

"Viewing the treaty in this light, we are of the opinion that the state is without power to charge the Yakimas a fee for fishing. A stated purpose of the licensing act was to provide for 'the support of the state government and its existing public institutions.' Laws of Washington (1937) 529, 534. The license fees prescribed are regulatory as well as revenue producing. But it is clear that their regulatory purpose could be accomplished otherwise, that the imposition of license fees is not indispensable to the effectiveness of a state conservation program. Even though this method may be both convenient and, in its general impact, fair, it acts upon the Indians as a charge for exercising the

very right their ancestors intended to reserve. We believe that such exaction of fees as a prerequisite to the enjoyment of fishing in the 'usual and accustomed places' cannot be reconciled with a fair construction of the treaty. We therefore hold the state statute invalid as applied in this case."

Although the court's decision contains language which purports to uphold the power of the state to impose restrictions of a regulatory nature on treaty Indians with respect to the time and manner of fishing outside the reservation, no such question was before the court for decision in the *Tulee* case. As pointed out in the first opinion in the *Satiacum* case, four judges of this court believed the language in the *Tulee* case to be dictum because it was not necessary to the decision.

In my opinion, the decision of the Supreme Court, on the question presented to it in the *Tulee* case, compels an affirmance of the trial court's judgment. If under the Yakima treaty the state may not exact a $5 license fee from a member of the tribe for exercising his treaty right to fish at the usual and accustomed places, how can the state completely prevent, for a 10-day period, a Swinomish Indian, who has precisely the same fishing rights under the Treaty of Point Elliott, from fishing at all. If the state can impose such prohibition for a period of 10 days, it may do so for 30 or 90 days or longer. In the *Tulee* case, the treaty Indian would have been deprived of $5 in consideration for a whole year's right to fish, while, in the present case, the treaty Indian is completely deprived by the state of his usual means of livelihood. Furthermore, his source of family food is entirely shut off during this period.

At this point, reference should be made to the thorough and exhaustive memorandum of the learned trial judge in which he discusses both the testimony and numerous exhibits admitted at the trial, and also many court decisions bearing on the questions involved. His summation is 48 pages in length and unfortunately cannot be quoted in full in this opinion.

In the memorandum opinion, the trial court described in detail the background and circumstances surrounding

the making of the Treaty of Point Elliott in 1855 between the Swinomish Tribe and Governor Isaac I. Stevens of the Territory of Washington, who represented the United States. Concerning the dependence of the Swinomish Tribe on fishing as their principal means of livelihood at the time the treaty was negotiated in 1855, the trial court said:

"To say merely that these Indians were 'fish eating' would be to convey a wrong impression. The testimony clearly indicates that these people caught fish in order to exist. Fish was the main part of their diet not only in the spring and summer but it was dried and saved for winter. Their reliance upon fish is substantiated by Governor Stevens' statement at the Walla Walla Council May 29, 1855, following the *Point Elliott Treaty*. . . . The *Point Elliott Treaty* itself supports the contention by providing in *Article V* for the right of 'erecting temporary houses for the purpose of curing . . .' fish. There is also an interesting comment about the Lummi tribe located immediately to the north in *United States v. Stotts, supra* [49 F. (2d) 619]:

" 'I think the court may judicially know that the Indians subsisted during this time by hunting and fishing, and the tide lands were a necessary perquisite to the enjoyment of fishing . . .'

"As a result of the Treaty and the Executive Order, the Swinomish Indians moved to the small peninsular reservation on the south tip of Perry's Island (Fidalgo Island). It was obviously a rocky, hilly bit of land covered by forest in most places except for portions that were tidal marsh. . . . Very little of it was then or is today conducive to profitable or successful farming. Even wild game was apparently not too plentiful on the peninsula because, according to Alex Edge, fish was all they used to live on.

"It was obvious from the nature of the peninsula and the background of the Indians who were to occupy it that their major means of subsistence on the peninsula would be to catch, eat and sell fish or to cut and sell timber. . . ."

Later, in its written opinion, the trial court again referred to respondent's treaty rights as follows:

"As previously indicated, Governor Stevens' *Point Elliott Treaty* negotiations never hinted at or made mention of a limitation upon the Indians' right to fish at their usual and accustomed grounds. As he discussed the purposes of the

Treaty and desires of the Great White Father, he left the distinct impression that the Indians could fish as necessary, as they have since time immemorial. . . . It will be remembered that these negotiations took place through interpreters.

"The Governor's statements were made at a time when the northwest was a wilderness. They were made at a time when Indians and white men alike hunted and fished as they desired without let or hindrance from the Federal or Territorial Governments. Regulations of fish and game were neither known nor dreamed of. The Indians had fished for salmon in the Skagit Bay area since time immemorial. The catching of salmon was necessary for the sustenance of themselves and their families. Neither the Governor nor the Indian chiefs could possibly have visualized present day restrictions. They entered into the treaty agreement under conditions as they existed at that. time. Thus, we must interpret the Treaty and the rights of the Swinomish Indians in light of what they then knew about need for regulation, keeping in mind that both parties knew the needs and abilities of the Indians would obviously grow in the future.

"Without any doubt the Governor and the Indians signed the Treaty fully intending that the Indians should be forever allowed to catch salmon 'at their usual and accustomed grounds' without restriction. We must follow that intent. As stated in *State v. Edwards, supra* [188 Wash. 467, 62 P. (2d) 1094],

"' . . . they had a right to assume that, though the treaty limited them to a certain peninsula, their rights on that peninsula were as broad and unrestricted as they had been before. . . .

"' . . . we are bound to construe the grant contained in the treaty, as fixed by the executive order, as it would naturally be understood by the Indians.' "

In arriving at the foregoing conclusion our Supreme Court quoted at length from *Jones v. Meehan, supra* [175 U. S. 1, 44 L. Ed. 49, 20 S. Ct. 1], as follows:

"'In construing any treaty between the United States and an Indian tribe, it must always . . . be borne in mind that the negotiations for the treaty are conducted, on the part of the United States, an enlightened and powerful nation, by representatives skilled in diplomacy, masters of a written language, understanding the modes and forms of creating the various technical estates known to their law, and assisted by an interpreter employed by themselves;

that the treaty is drawn up by them and in their own language; that the Indians, on the other hand, are a weak dependent people, who have no written language and are wholly unfamiliar with all the forms of legal expression, and whose only knowledge of the terms in which the treaty is framed is that imparted to them by the interpreter employed by the United States; and that the treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians. . . .'

"It may be conceded that there is an ambiguity contained in the Treaty; however, that ambiguity, if there is one, should be resolved in favor of the Indians, *Winters v. United States, supra* [207 U. S. 564, 52 L. Ed. 340, 28 S. Ct. 207].

"Inasmuch as the defendant was fishing in a usual and accustomed fishing ground of the Swinomish tribe, he had a right to fish in the area where he was arrested. The treaty right provided for in *Article V of the Treaty of Point Elliott* is not subject to control by the State of Washington. . . ."

The portions of the findings of fact and conclusions of law quoted below are essential to an understanding of the basis for the trial court's judgment.

After finding that respondent was a member of the Swinomish Indian Tribe, which was a party to the Treaty of Point Elliott (12 Stat. 927), and was entitled to the protection of the treaty, the court found:

"C. *Was the defendant fishing at a location protected by his rights under the Treaty of Point Elliott?*

"FINDINGS OF FACT

"I. The area reserved for the Swinomish Indian Reservation was then and is a rocky, hilly bit of land covered by forest in most places except for portions that were tidal marsh. Very little of it was then or is today conducive to profitable or successful farming, and it was not then and is not now abounding in wild game. Without a salmon fishery, the reservation was incapable of producing adequate food. Fish from the immediately surrounding waters and the bounding river had always been their major, if not sole, diet.

"II. At the time of negotiation of the Treaty of Point Elliott the Swinomish Indians, and thereafter the Indians living on the Swinomish Indian Reservation, fished for a livelihood, taking fish from the surrounding waters including the Skagit River as it flowed past the south end of the peninsula upon which the reservation was located. The Indians used the caught fish for their own purposes and for sale and trade to white men. The catching of salmon was necessary for the sustenance of the Indians and their families.

"III. At the time of negotiating the Treaty of Point Elliott, Governor Stevens, who represented the United States Government, made no mention of any restriction on the Indians' right to fish, and represented that the Indians could fish as they needed, as they had since the time of their forefathers. The Indians intended that insofar as the Skagit River bounded the south end of the reservation its use was to be reserved to them for fishing as they needed for their livelihood. It was the intent of the parties to the Treaty of Point Elliott that the Indians have reserved to them the right to fish in and use the Skagit River and take such fish as were necessary for their personal and commercial use.

". . .

"VIII. The defendant was fishing in the area of the Skagit River as it was relocated by the Federal Government.

"D. *Was the defendant fishing at a 'usual and accustomed fishing ground' as that phrase is used in the Treaty of Point Elliott?*

"FINDINGS OF FACT

"I. The Indians originally fished with Indian traps in and near the area which is presently called the 'jetty drift.'

"II. The Indians speared fish in the shallow gutters made by the Skagit River on the tide flats all the way from Bald Island westerly to deep water, which would cover the area of the jetty drift.

"III. The Indians fished with bait from canoes near the Hole-in-the-Wall.

"IV. Article V of the Treaty of Point Elliott reserved to the Indians the right of taking fish at 'usual and accustomed grounds and stations.' "

I would affirm the trial court's judgment in this case because, while the Indians' methods of fishing have changed

since 1855 when the Treaty of Point Elliott was made, the supremacy clause of the United States Constitution has not been changed. It still provides:

" 'This Constitution, and the laws of the United States which shall be made in pursuance thereof; and *all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby*, anything in the Constitution or laws of any state to the contrary notwithstanding.' " (Italics mine.)

This court is bound by *all* treaties made under the authority of the United States. Such treaties are by the Federal Constitution declared to be "the supreme law of the land."

This court is also bound by the decisions of the United States Supreme Court as to the validity and interpretation of treaties.

As I read its decisions, Indian treaties were regarded by that court from 1832 to 1962 as being the supreme law of the land the same as treaties with foreign nations. See cases cited in the first *Satiacum* opinion.

In 1924, the rights of Japanese nationals under the then existing Japanese treaty were declared in *Asakura v. Seattle*, 265 U. S. 332, 68 L. Ed. 1041, 44 S. Ct. 515, to be supreme over the police power of the state of Washington.

In 1942, the *Tulee* case was decided which construed the Yakima treaty as preventing the state of Washington from charging a member of the tribe a $5 fee for a fishing license to fish at "the usual and accustomed places."

In 1953, the Supreme Court of Idaho upheld the treaty right of the Nez Perce Indians to hunt for game without obtaining a license from the state. *State v. Arthur*, 74 Idaho 251, 261 P. (2d) 135 (1953). The state's application for certiorari was denied, 347 U. S. 937, 98 L. Ed. 1087, 74 S. Ct. 627.

In 1962, in the *Kake* case (quoted above), we are told that even on Indian reservations state laws may be applied to Indians unless such application would interfere with self-government or impair a right granted or reserved by federal law. No treaty was involved in that case.

In the recent en banc decision of this court in *State v. Bertrand*, 61 Wn. (2d) 333, 378 P. (2d) 427 (1963), we had occasion to pass upon the question of whether state courts had jurisdiction to resolve internal disputes of the Quinault Tribe. In answering this question in the negative, this court quoted the following from Cohen, Handbook of Federal Indian Law (page 123), after observing that:

"It is difficult, if not impossible, to define the legal status of 'treaty Indian tribes' in a few words. It is sufficient for the purpose of this opinion to state:

" 'The whole course of judicial decision on the nature of Indian tribal powers is marked by adherence to three fundamental principles: (1) An Indian tribe possesses, in the first instance, all the powers of any sovereign state. (2) Conquest renders the tribe subject to the legislative powers of the United States and, in substance, terminates the external powers of sovereignty of the tribe, e.g., its power to enter into treaties with foreign nations, but does not by itself *affect the internal sovereignty of the tribe*, i.e., its powers of local self-government. (3) These powers are subject to qualification by treaties and by express legislation of Congress, but, save as thus expressly qualified, full powers of internal sovereignty are vested in the Indian tribes and in their duly constituted organs of government.' (Italics ours.)"

The majority opinion in the present case relies on the *Kake* case and upon the dictum in *Tulee* and other decisions based thereon. I do not agree that the repetition of dictum (no matter how often repeated) makes it the law of the land. I think that to be binding on this court under the supremacy clause, there must be a decision of the Supreme Court in a case involving a treaty Indian who is claiming as against the state a treaty right relating to hunting or fishing.

As of the present time, we have two cases squarely in point: (1) the *Tulee* case, which upheld the treaty right of the Indian to fish at usual and accustomed places without paying for a fishing license, and (2) the decision of the Idaho Supreme Court concerning a similar right to hunt game (*State v. Arthur, supra*) in which the state's petition

for certiorari failed to receive the four votes necessary to granting a hearing by the United States Supreme Court.

In view of the present state of the controlling decisions and the supremacy clause of the United States Constitution, what is now binding upon this court? The only logical answer is the *Tulee* case (disregarding the dictum).

If this court is to follow *Tulee*, it seems to me that the judgment of the trial court must be affrmed. If the state has no power to charge a treaty Indian $5 to exercise his treaty right to fish at the usual and accustomed places, then it follows that the state may not absolutely prohibit him from exercising such right for 10 days or any other period of time. Such action could result in his being deprived of his normal supply of food for an entire year. The Treaty of Point Elliott was intended to insure respondent's unrestricted right to fish to sustain himself and his family unless and until it shall be abrogated or modified by Congress.

The most recent decision of the United States Court of Appeals on this general subject is *Maison v. Confederated Tribes of Umatilla Indian Reservation*, 314 F. (2d) 169 (C.A. 9th 1963).

I recognize the very serious practical problem facing the state of Washington in the conservation of salmon both for commercial fishing and for sportsmen. But, until the Supreme Court holds in a case squarely presenting the issue that an Indian treaty is not the law of the land under the supremacy clause, the state's only legal remedy is that suggested in the last paragraph of the first *Satiacum* opinion which dealt with the Puyallup Indians. It was there stated, at page 529:

"To summarize, the treaty of Medicine Creek of 1855 is the supreme law of the land and, as such, is binding upon this court, notwithstanding any statute of this state to the contrary, and its provisions will continue to be superior to the exercise of the state's police power respecting the regulating of fishing at the places where the treaty is applicable until:

"(1) the treaty is modified or abrogated by act of congress, or

"(2) the treaty is voluntarily abandoned by the Puyallup tribe, or

"(3) the supreme court of the United States reverses or modifies our decision in this case."

The solution of the problem lies with the Congress. Certainly this court should not disregard the Treaty of Point Elliott as the supreme law of the land in the absence of controlling precedent from the Supreme Court.

As stated above, I would affirm the trial court's judgment.

March 13, 1964. Petition for rehearing denied.

